Frank Cole WHALEN, Jr., Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

Supreme Court of Delaware.

Submitted Jan. 10, 1980.

Re-submitted on Supplemental
Briefing July 30, 1980.

Decided in Part Dec. 15, 1980.

Submitted on Motion for Reargument
Jan. 19, 1981.

Decided on Motion for Reargument and
Matter Reserved for Decision
July 6, 1981.

Nancy Jane Mullen (Argued), and Richard E. Fairbanks, Jr., Asst. Pub. Defenders (Argued), Wilmington, for defendant below, appellant.

Dana C. Reed, Deputy Atty. Gen. (Argued), James E. Liguori, Deputy Atty. Gen. (Argued), Dover, and Richard A. McMahon, State Prosecutor, Wilmington, for plaintiff below, appellee.

Before HERRMANN, C.J., DUFFY, McNEILLY, QUILLEN and HORSEY, JJ., constituting the Court En Banc.

McNEILLY, Justice:

The defendant, Frank Cole Whalen, Jr., was indicted, tried and convicted by a Superior Court jury of Murder First Degree [11 *Del.C.* § 636(a)(2)], Rape First Degree [11 *Del.C.* § 764(1)], and Burglary First Degree [11 *Del.C.* § 826(2)].[1] Following his conviction of Murder First Degree a separate penalty hearing was held pursuant to 11 *Del.C.* § 4209. The jury recommended the death penalty. The Trial Judge accepted this recommendation and imposed the death penalty on the murder conviction together with separate sentences on the convictions of rape and burglary. Defendant appeals his convictions and the imposition of the death penalty. Multiple errors are asserted by defendant which will be considered *seriatim.*

Briefly stated, the charges against defendant arose out of the rape and murder by strangulation of Elva D. Kemp shortly after 10:00 P.M. in the evening of August 27, 1977. Mrs. Kemp was a petite five feet four, seventy-five pound lady ninety-three years of age. The attack occurred in the Kemp home at Clayton, Delaware, where Mrs. Kemp and her ninety-three year old blind, and almost totally deaf, invalid husband were sleeping peacefully in their bedroom.

The twenty-one year old, six foot tall, one hundred seventy-five pound defendant, Frank Cole Whalen, Jr., was a gainfully employed high school graduate. He lived in a basement apartment across the street from the Kemp residence with his wife and young child. The defendant's uncle and aunt lived next door to the Kemps, and Mr. William Whalen, the uncle, for several months prior to Mrs. Kemp's murder had daily assisted Mr. Kemp out of bed in the early morning and helped him back to bed in the evening. It was Mr. William Whalen who discovered Mrs. Kemp's semi-nude body on her bed the morning after her murder, and at the same time found Mr. Kemp lying helplessly on the floor beside his bed.

## TRIAL

### I

In preparing for jury selection the defendant submitted fifty-eight questions[2] to the Court for preliminary submission to the entire jury panel prior to the drawing of prospective jurors who, in a criminal case in which the death penalty may be imposed, are individually interrogated on *voir dire* and thereafter individually sworn or discharged as the case may be. The Trial Judge rejected all questions requested and further denied defense counsel the privilege of questioning each individual prospective juror. Instead, the Trial Judge propounded his preliminary questions to the entire panel, removed certain names after responses were made, then continued with the individual selection process. After the names of those who had not responded were exhausted without filling the number to be selected, the Trial Judge began individual selection and questioning of those who had responded.[3] During jury selection, if counsel was not satisfied with the answers given by prospective jurors to the Trial Judge's questions, each side was given an opportunity to request additional questioning. In some instances the Trial Judge asked additional

---

1. For copies of indictments and provisions of applicable statutes see Appendix # 1.

2. Copies of the requested questions appear in Appendix # 2.

3. The colloquy regarding the preliminary questions and the actual questions asked appear in Appendix # 3.

questions to those required by statute, and when he did not, counsel appear to have been satisfied.[4]

■ The examination of prospective jurors and the limitations imposed thereon is vested within the broad discretion of the Trial Judge and, "... as a general rule, in the exercise of the discretion vested in him by [Superior Court Criminal] Rule 24(a), the trial judge should reserve to himself the function of interrogating prospective jurors upon *voir dire* examination as heretofore; provided, however, that reasonable opportunity be accorded to counsel to submit to the trial judge requested questions to be asked the prospective jurors, to be accepted or rejected by the judge in the exercise of a sound judicial discretion." *Parson v. State*, Del.Supr., 275 A.2d 777, 784 (1971). We find no error in the Trial Judge's ruling denying counsel's request to individually question prospective jurors.

At first blush, however, the Trial Judge's refusal to propound at least those questions submitted by the defendant to be asked the full panel of prospective jurors relating to the nature of the offense, age of the victim and other surrounding circumstances which might tend to ferret out possible prejudice, evidences an attitude of "forget the minor details, let's get on with the work at hand," despite the nature of the case and substance of the questions submitted.[5]

With this in mind we examined carefully the selection of each juror, noting also that:
"The purpose of the *voir dire* examination of prospective jurors is to give the trial judge sufficient information to determine whether or not a prospective juror is qualified. In addition, it aids the State and the defendant by eliciting facts upon which they can exercise intelligently rights to peremptory challenges. Any limitation imposed by the trial judge upon defendant's right to have prospective jurors questioned will not constitute reversible error unless the broad discretion reposed in the trial judge has been

clearly abused to the prejudice of the defendant." *Parson v. State*, 275 A.2d at 780–81.

■ Having carefully scrutinized the jury selection we are satisfied that the Trial Judge acted properly within his discretionary powers and therefore reject defendant's contention that the Trial Judge abused his discretion in declining to submit defendant's requested questions to the panel and in declining to permit counsel to personally examine prospective jurors.

## II

Defendant contends the Trial Judge erred in admitting defendant's oral and written inculpatory statements because the State did not meet its burden of establishing that they were obtained in compliance with *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and its progeny, or were otherwise voluntary.

It appears in the record that after interviewing a number of persons in the area concerning the Kemp murder, the police focused their attention upon three people as possible suspects. One of the three was Frank Cole Whalen, Jr. On Monday, following the Saturday night murder, the police called Mr. Whalen at his home around midnight and asked him to come to the Clayton Town Hall for questioning regarding the Kemp murder. Following the initial call Mr. Whalen called back to verify that it was the State Police and that they were at the Town Hall. A few minutes later Mr. Whalen's father called the Town Hall asking if the police wanted to see his son that evening or in the morning. At approximately 12:30 A.M. Mr. Whalen and his father appeared at the Town Hall and were met in front of the building by Detective Collison of the Delaware State Police. Detective Collison advised Mr. Whalen that he was there to be interviewed regarding the murder and burglary at the Kemp residence and secondly, that he would be asked

---

4. See 11 *Del.C.* § 3301 in Appendix # 1.

5. In particular questions 40, 41, 46, 57 and 58 focus on potential prejudice. See Appendix # 2.

if he would take a polygraph test. Although denied by defendant, Detective Collison testified that he explained the *Miranda* rights to Whalen at that time. The interview was not completed, however, because Detective Collison was called away. Before parting it was agreed that Mr. Whalen would return later in the day to continue the interview. In the meantime, Detective Collison was to arrange for the polygraph test.[6]

The next contact with Mr. Whalen occurred at approximately 6:45 P.M. that evening when Mr. Whalen, his wife and child, and his mother and father arrived at State Police Troop 3 after being contacted by Chief Bowers of the Clayton Police Department. In the meantime, Mr. Whalen and his wife had gone to Dover to keep a doctor's appointment during which Mrs. Whalen was advised that she was pregnant, to the great financial concern of Mr. Whalen, who claims he became upset and sought solace drinking vodka. No evidence appears in the record, however, that Mr. Whalen was intoxicated that evening. At Troop 3 Mr. Whalen was met by Detective Collison who took him to the polygraph room. The testing officer, Detective Bisbee, first filled out a pretest general information form, explained the polygraph procedure to Mr. Whalen, and presented a waiver form to Mr. Whalen which included all *Miranda* warnings except the right to have counsel present.[7] Mr. Whalen signed the waiver and testing was then begun.

According to Detective Bisbee's testimony, after asking a series of questions, the following occurred:

Q. Did you ask him anymore questions?

A. No. At that time I shut the instrument off due to his emotional condition.

Q. How long did it take you, roughly, to ask those questions and get those answers?

A. Approximately two, two-and-a-half minutes.

Q. When you say at that point you shut the instrument off due to his emotional condition, would you describe to the jury what you mean by that?

A. At the tenth question he began crying and appeared emotionally upset.

Q. Did you ask him anymore questions along those lines, the lines of the questions you had been asking him?

A. No further questions as far as a "Yes" or "No" answer.

Q. Did Mr. Whalen compose himself or continue crying?

A. I don't recall exactly how long he did cry. When I say "cry" I mean he just had his head down with tears coming out. He wasn't very vocal about it.

Q. What did you do then?

A. I then slid my chair around from behind the desk so I could be more in front of him. It would be an angle still but a little closer, off to his right but closer to him.

Q. What happened then?

A. To my recollection I would have asked him if he wanted to talk about it.

Q. Do you recall what he told you?

A. He asked me if he could start at the beginning.

Q. What did you say?

A. I asked him if he was going to start at the beginning if he would mind talking to another officer.

Q. What did Mr. Whalen say to you?

---

6. The Trial Judge, following a hearing on the defendant's motion to suppress his oral and written statements, found as a fact that the *Miranda* warnings had been given as the police testified. The jury likewise made its finding of fact at trial and also resolved the dispute of the *Miranda* warnings being given in favor of the State.

7. The right to have counsel present during questioning is omitted from the polygraph form because the nature of the polygraph procedure requires that only the examiner and the subject be in the testing room. A copy of the waiver form appears in Appendix # 4.

A. He said he would and he asked me if Chief Bowers was outside. We were enclosed in this room and he asked if Chief Bowers was outside.

Q. What did you say?

A. I said, "Yes," and asked him if he would talk to Sergeant Collison.

Q. What did he indicate in response to that inquiry?

A. He said that he would.

Detective Bisbee then left the room and requested that Detective Collison talk to Mr. Whalen. According to Detective Collison the following then occurred:

Q. Please tell the jury what happened when you went into the room?

A. I went into the room. Frank Whalen was sitting in the chair. I sat in Corporal Bisbee's chair. I asked him, "Are you willing to talk to me about this?" He said, "Yes. I don't why I did it," and he repeated that at least one more time, possibly twice.

Q. Then what did you say?

A. I advised him of his *Miranda* warnings.

Oral and written statements were then taken in detail and Mr. Whalen was placed under arrest. In his testimony defendant Whalen denied that the events occurred as the officers testified, indicated that he was worried and upset and had been drinking, indicated that he did not understand what his rights were or that he knowingly made any incriminating statements, denied waiving any rights, and contended that his statements were involuntarily given.

■ The burden of proof is upon the State, rather than the defendant, to demonstrate whether the defendant has been advised of his *Miranda* rights and has knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel. See *Tague v. Louisiana*, 444 U.S. 469, 100 S.Ct. 652, 62

L.Ed.2d 622 (1980). These issues must be determined under the totality of the circumstances including the behavior of the interrogators, the conduct of the defendant, his age, his intellect, his experience, and all other pertinent factors. *North Carolina v. Butler*, 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979); *State v. Rooks*, Del. Supr., 401 A.2d 943 (1979); *State v. Winsett*, Del.Super., 238 A.2d 821 (1968), *aff'd*, Del.Supr., 251 A.2d 199 (1968).

It was not argued in this appeal that the defendant was not advised of his *Miranda* warnings at the time of his first contact with the police at approximately 1 A.M. on the night following the murder. Nor is it argued that he was not given his *Miranda* warnings, with the exception of his right to counsel, or that he did not sign the polygraph waiver form immediately prior to submitting to the polygraph test. We have no doubt that the warnings were given.

■ The real question comes down to waiver, and our review of the record satisfies us that the State has met its burden of establishing a knowing and intelligent waiver of the privilege against self-incrimination and the right to counsel prior to his outburst during the polygraph testing and subsequent thereto when he was asked by Detective Collison if he wanted to talk.[8]

We first focus on the behavior of the law enforcement officers to determine if their interrogation or conduct during their contact with defendant was such as to overbear his will. There is no objective evidence in the record of any such conduct on the part of the police, nor is there any evidence that the defendant's statements were the product of words or actions on the part of the police which subjectively induced defendant to speak out against his will. See *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980).

The issue, therefore, is whether the defendant's statements were the product of a

8. When asked if he wanted to talk, the defendant replied, "Yes, I don't know why I did it." We do not believe asking a defendant if he wishes to talk is itself an interrogation under *Miranda*. Clearly, the defendant's answer ex-

ceeded the scope of the question, which was intended to ascertain only if the defendant would submit to an interrogation. See *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980).

rational mind and free will, and thus a knowing and intelligent waiver of his *Miranda* privilege against self-incrimination and his right to counsel.

Because of defendant's assertions at trial the State must bear a heavy burden to overcome the presumption that the defendant did not waive his rights. The Trial Judge and jury decided that defendant had done so and that his statements were voluntary. There is substantial evidence in the record to support those findings.

Although the defendant testified that he was worried, upset and had been drinking before taking the polygraph test, his father and mother testified that he did not appear upset, but, to the contrary, appeared composed and either rested or slept on the way to the police station to take the prearranged "lie detector" test. The defendant's mother did not know if he had been drinking, but his father said defendant had been drinking because his eyes were red, although there was no apparent odor of alcohol. Nevertheless, there is no evidence of intoxication in the record.

The defendant asserts his admission during the polygraph examination, that he had "hurt" the victim, was prior to receiving the *Miranda* warnings and that no subsequent waiver of his *Miranda* rights was shown. He contends the record does not show a waiver, but merely establishes circumstances where *Miranda* warnings were read and "a confession was in fact eventually obtained.". *Miranda v. Arizona*, 384 U.S. at 475, 86 S.Ct. at 1628, 16 L.Ed.2d at 724.

In responding to this argument, we note that at the outset defendant was read the *Miranda* warnings, knew the police were investigating the murder of the victim, and was aware he was to be questioned in connection with the investigation. The record further shows the defendant was not compelled to go to the police station to take the test and knew he was free to refuse. In addition, the defendant was left alone for about seventeen hours in the company of his family and friends, during which time he made the decision to go to the police station.

The *Miranda* warnings must be given *prior* to custodial interrogation. 384 U.S at 479, 86 S.Ct. at 1630, 16 L.Ed.2d at 726. The warnings need not be contemporaneous with every interrogation. In addition, the Supreme Court of the United States has highlighted the probative value of the circumstances surrounding a waiver.

"Whatever the testimony of the authorities as to waiver of rights by an accused, the fact of lengthy interrogation or incommunicado incarceration before a statement is made is strong evidence that the accused did not validly waive his rights. In these circumstances the fact that the individual eventually made a statement is consistent with the conclusion that the compelling influence of the interrogation finally forced him to do so. It is inconsistent with any notion of a voluntary relinquishment of the privilege. Moreover, any evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege." *Miranda v. Arizona*, 384 U.S. at 476, 86 S.Ct. at 1629, 16 L.Ed.2d at 724–25.

The circumstances of the defendant's appearance at the police station are without any indicia of involuntariness. We hold that his appearance at the police station for the polygraph test demonstrates a waiver of his *Miranda* rights.

### III

The defendant contends the Trial Court committed plain error in allowing the polygraph examiner to testify in detail regarding the polygraph test. Specifically, the examiner read each question asked from his notes, and testified as to the defendant's responses. The defendant had not agreed to allow use of the results of the examination in court. The test was terminated after approximately 2 ½ minutes. He examiner did not testify as to the data recorded by the polygraph machine, nor did he express an expert opinion about the truthfulness of the defendant's answers.

■■ "Polygraph examinations are generally held inadmissible for any purpose because their scientific reliability has not been established." *Foraker v. State*, Del.Supr., 394 A.2d 208, 213 (1978) (citations omitted). This general prohibition includes any reference to a defendant's refusal to take a polygraph test. *Duonnolo v. State*, Del. Supr., 397 A.2d 126 (1978). See Annot., 88 A.L.R.3d 227 (1978). However, some courts allow introduction of evidence that a polygraph test was administered in limited circumstances. When a confession was made during, immediately after, or as the result of test questioning, and the defendant alleges his confession was involuntary, the evidence about the test and the surrounding circumstances are considered part of the totality of the circumstances which must be evaluated. *E. g., Tyler v. United States*, D.C.Cir., 193 F.2d 24 (1951), *cert. denied*, 343 U.S. 908, 72 S.Ct. 639, 96 L.Ed. 1326 (1952); *Johnson v. State*, Md.Ct.Spec.App., 31 Md.App. 303, 355 A.2d 504 (1976); *State v. Bowden*, Me.Supr., 342 A.2d 281 (1975); *State v. Green*, Or.Supr., 271 Or. 153, 531 P.2d 245 (1975); *State v. Melvin*, N.J.Supr., 319 A.2d 450 (1974); *Johnson v. State*, Fla. D.Ct.App., 166 So.2d 798 (1964). *Contra, Fulton v. State*, Okl.Ct.Crim.App., 541 P.2d 871 (1975); *State v. Perry*, Minn.Supr., 274 Minn. 1, 142 N.W.2d 573 (1966) (holding any reference to a polygraph test, without prior agreement of the parties, is improper).

■ Because this State follows the Massachusetts' rule in assessing the voluntariness of a confession, we believe presentation to the trier of fact of all relevant facts and circumstances is appropriate when it must assess the totality of the circumstances. See *State v. Rooks, supra*. As a result, we hold that reference to the defendant's polygraph examination was properly allowed.

However, our analysis cannot stop there because the State did more than refer to the fact that the defendant broke down 2½ minutes into a polygraph test. It introduced the entire sequence of questions and answers from the examination.[9] *Cf. State v. Melvin, supra* (holding introduction of the questions asked during a test was harmless error). The defendant asserts, with some persuasiveness, that this evidence revealed the results of the examination, and because there was no prior agreement for such use, a revelation of the results was improper.[10]

9. The testimony of the polygraph examiner included the following:

A. The first question I asked, "Is your first name Frank?" to which he answered, "Yes."
Q. What was the second question?
A. "Do you live in the United States?" which he answered, "Yes."
Q. What was the third question?
A. "Do you plan to try to lie to me about this matter?" He answered, "No."
Q. What was the next question?
A. "Have you told the police the absolute truth about this matter?" He answered, "No."
Q. What was the next question?
A. "Do you drink water?" He answered, "Yes."
Q. What was the next question?
A. "Do you know who hurt Mrs. Kemp?"
Q. What was the answer?
A. "Yes."
Q. What was the next question?
A. "Did you see anyone hurt Mrs. Kemp?"
Q. What was the answer?
A. He answered, "No," and he talked. He answered, "No," and said, "Oshhh."
Q. Said what?
A. "Oshhh," like he had made a mistake in my opinion.
Q. What was the next question?
A. The next question was, "Are you twenty years old?"
Q. What was his answer?
A. He answered, "Yes."
Q. What was the next question.
A. "Were you present when Mrs. Kemp was hurt?"
Q. What was the answer?
A. He answered, "Yes."
Q. The next question?
A. "Did you hurt Mrs. Kemp?"
Q. And the answer?
A. He answered, "Yes."
Q. Did you ask him anymore questions?
A. No. At that time I shut the instrument off due to his emotional condition.
Q. How long did it take you, roughly, to ask those questions and get those answers?
A. Approximately two, two-and-a-half minutes.

10. Prior to the reading of the questions and answers, the Court stated, "The jury will find out that no polygraph examination was given and even if it was the results are not admissible."

Our holding that the fact of a polygraph examination is part of the totality of the circumstances should not be viewed as an approval of the use of the results of a polygraph test without prior agreement of the parties. The question which arises is what constitutes the "results" of a polygraph test? The Sixth Circuit has stated that:

"[polygraphs] record lines and variations on tape for interpretation by the operator. These lines and variations, or more specifically the interpretation of them, constitute the results of a lie detector test . . . ." *United States v. McDevitt*, 6th Cir., 328 F.2d 282, 284 (1964).

By implication, a broader definition was adopted in *State v. Mitchell*, Conn.Supr., 169 Conn. 161, 362 A.2d 808, 812 (1975). Because this issue was neither briefed nor argued, and because we have determined that if an error was committed, it was harmless beyond a reasonable doubt, we decline to delineate those items which comprise the results of the polygraph test.

■ The defendant's presence at and his testimony during the test were voluntary. As a result, the sole potential prejudice to the defendant from the use of the actual questions and answers was that the jury might infer the defendant might be more likely to tell the truth during a polygraph exam than at other times. See *State v. Melvin, supra.* This prejudice is limited to the potential that the jury might give undue credence to the answers elicited during the test. In light of that, we find any prejudice minimal in this case, because

"the defendant's own confession was many times more conclusive on the issue of guilt than any inference raised by the polygraph; and . . . in light of the State's corroborated confession . . . , we cannot perceive how the defendant was prejudiced by the inference that the result of

the polygraph examination was unfavorable to him. With or without the reading of the questions used in that examination, the jury could not responsibly have reached any other verdict." *State v. Melvin*, 319 A.2d at 460.

### IV

■ The defendant asserts the results of a field test for sperm were improperly admitted and consequently his rape conviction must be overturned. The defendant contends a test producing scientific evidence, like the Master Semen Test in question, must be shown to be "generally accepted by scientists active in the field," or the evidence therefrom should be inadmissible. See *Commonwealth v. Topa*, Pa.Supr., 471 Pa. 223, 369 A.2d 1277 (1977). The State concedes that its expert witness did not testify as to the Master Semen Test's general acceptance in the scientific community.

However, the State did produce expert witnesses to describe how the test was performed on the victim, what chemical the test is designed to detect, how the test indicates the presence of that chemical, the shelf-life of the test, and the effect of the presence of other chemicals on the validity of the test results. We do not agree with the defendant's assertion that "general scientific acceptance" is the only criteria by which to assess the admissibility of the results of a scientific test. See *State v. Moore*, Del.Super., 307 A.2d 548 (1973). We note that the State's evidence fulfilled the hallmarks of admissibility, relevance and reliability. See Del. Rules of Evid. 401, 402;[11] see also McCormick, *Law of Evidence* § 203 at 491 (2d ed. 1972).

In any event, although the defendant raised numerous objections to this evidence at trial, he did not object that the State failed to show "general scientific accept-

---

However, when the jury heard the questions and answers, it could infer from the defendant's failure to present expert testimony alleging the test proved the defendant's answers were incorrect that the machine showed the defendant's answers were truthful.

11. The codified Delaware Rules of Evidence did not become effective until July 1, 1980, subsequent to the trial in this case. However, the particular rules cited herein merely codified the common law evidentiary rules which were in use in this State at the time of trial.

ance" of the test. The defendant does not contend the State would have been unable to produce such evidence had this objection been raised in a timely manner. *Cf. Jenkins v. State*, Del.Supr., 305 A.2d 610, 613 (1973). Therefore, considering the untimeliness of the objection and the foundation that was established by the State, we conclude that the evidence from the Master Semen Test was properly admitted.

## V

The defendant objects to the use of three out-of-court statements at trial. First, he asserts that testimony about statements made by Grover Kemp, the victim's husband who died one week after the crime, was inadmissible as hearsay. The morning after the murder, Mr. Kemp, an invalid, was found by the defendant's uncle, and, according to the uncle's testimony, the following occurred: "Well, Mr. Kemp told me that he had bad news for me and I looked back down and I said 'What's that, Mr. Kemp?' and he said, 'Elva [the victim] passed away during the night!, and then I started helping him . . . ."

▮ This testimony was admitted under the excited utterance exception to the hearsay rule. See Del.Rule of Evid. 803(2). We agree with the defendant that the circumstances show the statement was not "induced by the shock of the event." *Littlejohn v. State*, Del.Supr., 219 A.2d 155, 157 (1966) (citations omitted). Thus, because the statement was not spontaneous, it was not admissible as an excited utterance.

We disagree, however, with the defendant's assertion of prejudice. The statement does not in any way implicate the defendant nor does it imply the existence of foul play. If any inference can be drawn from the statement it would be that Mr. Kemp believed the victim had "passed away" from natural causes. Therefore, we conclude the error was clearly harmless beyond a reasonable doubt. See Del.Rule of Evid. 103(a).

Second, the defendant argues the following questions and answers exhibit reversible error: [12]

Q. Let me ask this another way. Besides those things that you collected at the crime scene and including those things, did anyone of those individual items point specifically to Frank Cole Whalen, Jr. as the perpetrator of the crime?

A. Some of that material has never been analyzed. The material that was analyzed, such as hair samples, the F.B.I. findings are that there are similarities; however, they report that they cannot positively identify hair as being from a certain person even if they have the known and the unknown to compare it with, but there were certain similarities.

Q. Well, I asked the question, Sergeant Collison, but perhaps I didn't ask it clear enough. I asked if there was any specific information that pointed directly to Frank Cole Whalen, Jr., not if there was any general information.

A. My interviews of the residents, my search of the crime scene, my interview of Mr. Kemp, these things indicated that this defendant may have committed the crime.

The defendant asserts this was an impermissible reference to inadmissible hearsay. Clearly, the answer did not contain hearsay because those out-of-court statements were not mentioned "to prove the truth of the matter asserted." Del.Rule of Evid. 801(c). The reference to out-of-court statements was to show why the detective believed the defendant was a suspect and was not intended to show that those statements were accurate.

The defendant appears to recognize the propriety of the answer by claiming an impermissible reference to what could have been hearsay if presented in another form. The defendant does not cite any authority in support of his position, and we reject the assertion of error. Further, the answer

12. This exchange occurred during cross-examination of one of the investigating officers by defense counsel.

was in response to the defendant's cross-examination and the defendant did not object to the answer at trial. See Del.Rule of Evid. 103(a)(1).

Thirdly, the defendant alleges William Whalen's testimony that, upon turning on the light in the victim's bedroom, his wife said, "Oh my God, she's been raped.", was an inadmissible lay opinion on a matter requiring expert testimony. Immediately after the statement, the Trial Judge instructed the jury,

> "Let me caution the jury right there. I have already ruled that I would admit that statement as simply showing the spontaneous exclamation of a witness from her state of mind. It is obvious, of course, to us all that nobody can look at a person and tell they have been raped, so that is not proof of that charge. It just shows her state of mind, spontaneous exclamation that she made."

The Court was correct that this statement qualified as an excited utterance. In addition, the defendant did not object to the testimony at that point. In light of the limiting instruction and the lack of objection, we find no merit to the defendant's argument on this issue.

### VI

The defendant contends his conviction cannot stand because the State introduced a color photograph of the victim in connection with the testimony of the State Medical Examiner. Because a black and white photograph was available, he urges this Court to hold that the use of the black and white photo should have been required. Both pictures showed the bruises on the victim's neck indicating death by strangulation. They did not show open wounds or blood. "A Trial Judge has broad discretion to admit or reject photographs depicting a victim's injuries, and, 'absent abuse of discretion, the ruling will be sustained on appeal.'" *Conyers v. State*, Del.Supr., 396 A.2d 157, 160 (1978) (citation omitted).

This Court has affirmed verdicts where color photographs and slides of a victim's wounds have been used by the State. *E. g.,* *Casalvera v. State*, Del.Supr., 410 A.2d 1369 (1980); *Young v. State*, Del.Supr., 407 A.2d 517 (1979); *Shantz v. State*, Del.Supr., 344 A.2d 245 (1975). We have not required the use of the least dramatic means of presenting photographic evidence. *Casalvera v. State*, 410 A.2d at 1373. Clearly, allowing use of the color photograph in this case was not an abuse of discretion.

### VII

The defendant alleges the jury instructions did not adequately apprise the jury that a verdict of guilty of Murder First Degree required the jury to conclude the homicide was in furtherance of the rape. The defendant does not assert the instructions misstated the law. His only objection is that this aspect was not highlighted.

In addition, the defendant contends he was entitled to a specific instruction that the prior felony conviction of one of the State's witnesses could be used to evaluate his credibility. The defendant does not deny that he was permitted to present the evidence of the prior felony conviction. Nor does he deny that one defense witness was shown to have a prior felony conviction. Viewing the instructions in their entirety, we find both the defendant's allegations without merit. See *Jenkins v. State, supra,* 305 A.2d at 617.

### VIII

#### A

The defendant asserts his separate sentences for Rape First Degree, 11 *Del.C.* § 764(1), and for Murder First Degree (Felony Murder), 11 *Del.C.* § 636(a)(2), violate the prohibition against double jeopardy in the Constitution of the United States, which is applicable to the states. See *Benton v. Maryland*, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969). The argument is based primarily on our recent decision in *Hunter v. State*, Del.Supr., 420 A.2d 119 (June 24, 1980).

The first analytical step where, as here, a defendant claims to have been subjected to

multiple punishments in a single prosecution for a single offense, is to determine whether the Legislature intended to authorize such multiple sentences for the statutory offenses involved. If not, then the constitutional double jeopardy question need not be reached, since a court may not inflict greater punishment on a defendant than that authorized by the Legislature. See *Davis v. State*, Del.Supr., 400 A.2d 292 (1979); see also *Whalen v. United States*, 445 U.S. 684, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980).

Initially we note that the question of legislative intent cannot be answered solely by reference to § 636(a)(2) and § 764(1), since neither of these statutes expressly discusses the problem of multiple convictions and sentences under both. It appears to us that the only statutory provision which directly addresses this problem, albeit in a much broader context than that presented by the facts of this case, is 11 *Del.C.* § 206 which provides in pertinent part:

"Method of prosecution when conduct constitutes more than 1 offense.

(a) When the same conduct of a defendant may establish the commission of more than 1 offense, the defendant may be prosecuted for each offense. The defendant's liability for more than 1 offense may be considered by the jury whenever the State's case against him for each offense is established in accordance with § 301 of this title. He may not, however, be convicted of more than 1 offense if:

(1) One offense is included in the other as defined in subsection (b) of this section . . . .

\* \* \* \* \* \*

(b) A defendant may be convicted of an offense included in an offense charged in the indictment or information. An offense is so included when:

(1) It is established by the proof of the same or less than all the facts required to establish the commission of the offense charged. . . ."

In *Mackie v. State*, Del.Supr., 384 A.2d 625 (1978), we interpreted § 206(b) to mean that a defendant can be convicted of an offense not charged in an indictment under the three conditions alternatively cited therein. Section 206(b)(1) allows such conviction when that offense is a lesser included offense of the offense specified in the indictment. Thus, § 206(a)(1) prohibits convictions for two offenses when one is a lesser included offense of the other.

Applied literally, the above-quoted language of § 206 might lead to the conclusion that Rape First Degree is a lesser included offense of Felony Murder (Rape), since the former may be "established by the proof of the same or less than all the facts required to establish the commission of the" latter. However, at least in the context of Felony Murder and underlying felonies, we do not believe that the Legislature intended such a literal application. Prior to the enactment of § 206, this Court rejected the contention that the underlying felony is a "lesser offense included in the greater crime of [felony] murder. . . ." *Jenkins v. State*, Del. Supr., 240 A.2d 146, 149 (1968), *aff'd*, 395 U.S. 213, 89 S.Ct. 1677, 23 L.Ed.2d 253 (1969). We find nothing in the provisions of § 206 or elsewhere in the Delaware Criminal Code which indicates an intention to legislatively overrule the *Jenkins* holding.

Moreover, the societal interests sought to be protected by the statutes here involved are entirely separate and distinct. The Rape statute seeks to protect women from sexual assault, while the Murder statute seeks to protect human life. Consequently, we believe that the Legislature intended to leave the *Jenkins* rule intact when enacting § 206, and we hold that Rape is not a lesser included offense of Felony Murder (Rape). *Compare Whalen v. United States, supra*, 445 U.S. at 712, 100 S.Ct. at 1449, 63 L.Ed.2d at 738 (Rehnquist, J., dissenting. Therefore, we conclude that the Legislature did intend to authorize separate convictions and sentences for Felony Murder and the underlying Rape First Degree in this case. Thus, the double jeopardy argument based on *Hunter v. State, supra*, is squarely presented.

B

As in *Hunter* we distinguish, for double jeopardy purposes, between the convictions for the instant crimes and the separate sentences imposed thereon. The convictions, having been obtained in a single prosecution, do not violate the Double Jeopardy Clause and are, therefore, affirmed. The only issue is whether the separate sentences imposed on the convictions may stand.

A significant number of jurisdictions have addressed the question of separate prosecutions and/or convictions and sentences for both Felony Murder and the underlying felony in recent years. Some cases, like the case *sub judice*, have involved single prosecutions for these offenses, while others have involved successive prosecutions. To say that the rationales and results have not been consistent would be an understatement.

For cases approving dual convictions and sentences see: *People v. Berzups*, N.Y.Ct. App., 49 N.Y.2d 417, 426 N.Y.S.2d 253, 402 N.E.2d 1155 (1980); *Whalen v. United States*, D.C.Ct.App., 379 A.2d 1152 (1977), *rev'd*, 445 U.S. 684, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980); *State v. Lujan*, Ariz. Supr., 124 Ariz. 365, 604 P.2d 629 (1979); *Harris v. State*, Okl.Ct.Cr.App., 555 P.2d 76 (1976), *rev'd*, 433 U.S. 682, 97 S.Ct. 2912, 53 L.Ed.2d 1054 (1977); *Commonwealth v. Sparrow*, Pa.Supr., 471 Pa. 490, 370 A.2d 712 (1976); *People v. Green*, Ill.Supr., 62 Ill.2d 146, 340 N.E.2d 9 (1975), *cert. denied*, 426 U.S. 925, 96 S.Ct. 2635, 49 L.Ed.2d 379 (1976); *Turner v. State*, Ark.Supr., 248 Ark. 367, 452 S.W.2d 317 (1970), and 251 Ark. 499, 473 S.W.2d 904 (1971), *rev'd*, 407 U.S. 366, 92 S.Ct. 2096, 32 L.Ed.2d 798 (1972); *State v. Hall*, Id.Supr., 86 Idaho 63, 383 P.2d 602 (1963); *State v. Orth*, Oh.Ct.App., 106 Ohio App. 35, 153 N.E.2d 394 (1957), *appeal dismissed*, Oh.Supr., 167 Ohio St. 388, 148 N.E.2d 917 (1958); *State v. Barton*, Wash. Supr., 5 Wash.2d 234, 105 P.2d 63 (1940).

For cases rejecting dual convictions and sentences see: *State v. Morgan*, Mo.Supr., 592 S.W.2d 796 (1980), *vacated and remanded*, 449 U.S. 809, 101 S.Ct. 56, 66 L.Ed.2d 112 (1980); *State v. Pinder*, Fla.Supr., 375 So.2d 836 (1979); *State v. Innis*, R.I.Supr., 391 A.2d 1158 (1978), *vacated on other grounds*, 44 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980); *Mitchell v. State*, Ind. Supr., 382 N.E.2d 932 (1978); *Briggs v. State*, Tenn.Supr., 573 S.W.2d 157 (1978); *State v. Fish*, Or.Supr., 282 Or. 53, 577 P.2d 500 (1978); *Stanley v. State*, Ga.Supr., 240 Ga. 341, 241 S.E.2d 173 (1977), *cert. denied*, 439 U.S. 882, 99 S.Ct. 218–19, 58 L.Ed.2d 194 (1978); *Newton v. State*, Md.Ct.App., 280 Md. 260, 373 A.2d 262 (1977); *Ex parte Jewel*, Tx.Ct.Cr.App., 535 S.W.2d 362 (1976); *People v. Anderson*, Mich.Ct.App., 62 Mich.App. 475, 233 N.W.2d 620 (1975); *State ex rel. Wikberg v. Henderson*, La. Supr., 292 So.2d 505 (1974); *State v. Thompson*, N.C.Supr., 280 N.C. 202, 185 S.E.2d 666 (1972); *State v. Thomas*, N.J.Super.L.Div., 114 N.J.Super. 360, 276 A.2d 391 (1971), *modified on other grounds*, N.J. Supr., 61 N.J. 314, 294 A.2d 57 (1972); *Ronzani v. State*, Wisc.Supr., 24 Wis.2d 512, 129 N.W.2d 143 (1964).

While the United States Supreme Court has already spoken in the context of successive prosecutions for Felony Murder and the underlying felony, see *Harris v. State, supra*, the Court has yet to explicitly clarify the application of double jeopardy law to dual convictions and sentences in a single prosecution. Although the Court had an excellent opportunity to do so in *State v. Morgan, supra*, its cryptic order vacating the state court's judgment and remanding the case "for further consideration in light of *Whalen v. United States*, 445 U.S. 684, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980)," 449 U.S. 809, 101 S.Ct. 56, 66 L.Ed.2d 12, raises at least as many questions as it answers. Most importantly, the order in *Morgan* leaves open this critical question: did the Missouri Supreme Court reach the right result for the wrong reasons or the wrong result for the wrong reasons? It is difficult for us to discern how *Whalen v. United States, supra*, aids this inquiry, since that case merely determined that the Congress did not intend to authorize multiple sentences for Felony Murder and the underlying felony of rape in the District of Colum-

bia.[13] We have had prior occasion to comment on the ambiguities raised by the decision in *Whalen v. United States, supra,* see *Hunter v. State, supra,* and see no purpose in discussing these matters in further detail herein. Suffice to say that the decision in *Morgan* has done little, if anything, to clarify these double jeopardy ambiguities.

As for the Delaware law on the question presented, we have in the past allowed separate sentences for Felony Murder and the underlying felony. See *Jenkins v. State, supra.* However, we recognize that if the *Blockburger*-like [14] test adopted in *Hunter v. State, supra,* is to be applied in the present context, the continuing vitality of the *Jenkins* double jeopardy ruling on multiple sentences is open to serious doubt. The question, therefore, is whether the *Hunter* analysis should be applied in the Felony-Murder/underlying-felony context.

Normally, we would not hesitate to reach the merits of an issue expressly raised on appeal. However, there are special circumstances which we believe counsel against rendering a substantive ruling on the double jeopardy issue presented herein at this time. As noted above, the application of double jeopardy principles in the Felony Murder context is anything but well-settled. Although extension of the federal constitutional analysis delineated in *Hunter* to the Felony Murder context would eliminate much of the confusion, the propriety of that analysis has been disputed by members of this Court, see *Hunter v. State, supra,* 420 A.2d at 132–34 (Quillen, J., and McNeilly, J., dissenting), and is, in fact, the subject of a pending petition for certiorari by the State to the United States Supreme Court. See 49 U.S.L.W. 3273 (petition filed August 22, 1980). Moreover, this Court has not as yet, expanded the *Hunter* analysis beyond the crimes of Possession of a Deadly Weapon During the Commission of a Felony, 11 Del.C. § 1447, and the underlying felonies. Under these circumstances, we believe that the wisest course for us to follow is to refrain from rendering a substantive decision on the double jeopardy issue, reserving jurisdiction thereon, until such time as the United States Supreme Court has itself ruled on the State's petition in the *Hunter* case.

We hasten to emphasize that the appellant will eventually be heard on the merits of his double jeopardy argument in this Court. We perceive no prejudice to the appellant from the interim delay which will necessarily result from our decision, since he is presently incarcerated under a thirty year prison sentence on his instant conviction for Burglary First Degree (which conviction and sentence we affirm by our decision today). In other words, whatever decision we eventually reach on the double jeopardy issue will have no impact whatsoever on the sentence which the appellant is presently serving. Given this lack of prejudice to the appellant, and given the justifiable reliance of prosecutors and trial courts in this State on the *Jenkins* double jeopardy rule for the past twelve years, we believe the cautiously prudent approach adopted herein is entirely reasonable at the present time. At such time as the United States Supreme Court has rendered a final decision in the *Hunter* case, either by denying the State's petition or by granting the petition and issuing a substantive ruling thereon, we will reactivate our consideration of the double jeopardy issue in this case upon appropriate application by either party.

### IX

### PENALTY HEARING

▉ We now turn to the defendant's assertions of errors in his penalty hearing

---

**13.** We do not believe that the remand in *Morgan* stands for the proposition that the state law question of legislative intent is necessarily dispositive of the double jeopardy issue. Were this true, then outright reversal, rather than remand, would have been the appropriate disposition in *Morgan,* since prior Missouri law clearly permitted the imposition of multiple sentences for Felony Murder and the underlying felony in a single prosecution. See *State v. Chambers,* Mo.Supr., 524 S.W.2d 826 (1975), *cert. denied,* 423 U.S. 1058, 96 S.Ct. 794, 46 L.Ed.2d 649 (1976), *overruled on federal constitutional grounds, State v. Morgan, supra,* 592 S.W.2d at 801.

**14.** *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932).

under 11 *Del.C.* § 4209. The defendant asserts his penalty hearing was constitutionally defective and that his sentence of death must be reversed. Specifically, he argues that the jury was allowed to consider whether the victim was "elderly" or "defenseless" as statutory aggravating circumstances, when both of those terms subsequently have been declared unconstitutionally vague. *State v. White,* Del.Supr., 395 A.2d 1082 (1978). In addition, the jury did not specify which statutory aggravating circumstance it found under § 4209(e), as required by this Court. *State v. White, supra.* We agree that the penalty hearing was defective and reverse the defendant's death sentence.[15]

In *State v. White, supra,* we held the terms "elderly" and "defenseless" unconstitutionally vague. 395 A.2d at 1090–91. While the defendant was found guilty of rape, itself a statutory aggravating circumstance, we are not prepared to assume the defendant was not prejudiced by this error. In addition, in *White* this Court stated:

> "The *Furman* decision held that in order to minimize the risk that the death penalty would be imposed capriciously, the decision to impose it had to be channeled by statutory standards so that the sentencing authority would be obliged to focus on the particularized circumstances of the crime and of the defendant. Requiring the sentencing authority to find and identify at least one *statutory* aggravating circumstance before being empowered to recommend a death sentence is an essential element of constitutional death

penalty procedures under the law, as now clearly prescribed. But, in so doing, there is no proscription against consideration of aggravating circumstances other than those listed in the Statute."

395 A.2d at 1088 (emphasis in the original).

The penalty hearing in question was held before our decision in *White.* However, in light of our duty under *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), *rehearing denied,* 429 U.S. 875, 97 S.Ct. 197–98, 50 L.Ed.2d 158 (1976), we cannot overlook the failure to meet the requirements in § 4209(d)(1)(a), as construed in *White.* The jury must identify and specify in the verdict at least one aggravating circumstance relied upon by them in determining that the death penalty be imposed beyond a reasonable doubt, and the unanimous recommendation for a sentence of death must be the result of the jury having weighed all relevant evidence in aggravation or mitigation which bears upon the particular circumstances or details of the commission of the offense and the character and propensities of the offender. 395 A.2d at 1090.

## X

In conclusion, we affirm the defendant's conviction and sentence for Burglary First Degree; we affirm the convictions for Murder First Degree and Rape First Degree; and we reverse the death sentence on his Murder First Degree conviction. As to all

---

**15.** Because we have reserved judgment on the double jeopardy question, see Section VIII, *supra,* it makes no present sense to remand the case to the Trial Court for another penalty hearing under 11 *Del.C.* § 4209. This is because depending on our eventual resolution of the double jeopardy question, the State may ultimately be required to elect to have the appellant resentenced on either the Murder First Degree or the Rape First Degree conviction. *Cf. Hunter v. State, supra,* and *Evans v. State,* Del.Supr., 420 A.2d 1186 (1980). Thus, depending on the State's election (if such is required), the appellant may or may not be required to undergo another § 4209 penalty hearing on remand. However, three factors have persuaded us that we should resolve the death

penalty issues raised in this appeal at the present time rather than reserve judgment thereon until we are prepared to rule on the double jeopardy matters and remand the case to the Trial Court.

First, the death penalty issues must necessarily be resolved at some point during this appeal. Second, the special circumstances which persuaded us to stay our hand on the double jeopardy issues do not exist as to the death penalty issues. Third, these death penalty questions have immediate importance to ongoing murder trials and should, therefore, be resolved as soon as possible for the guidance of the Superior Court in the conduct of such cases.

issues involved in the double jeopardy questions raised on this appeal and discussed in Section VIII, *supra*, we reserve jurisdiction pending further developments on the State's petition for a writ of *certiorari* in the United States Supreme Court in *Hunter v. State, supra.*

\* \* \* \* \* \*

AFFIRMED, in part; REVERSED, in part; and JURISDICTION RESERVED, in part.

## APPENDIX # 1

INDICTMENTS:

Cr. A. No. IK–77–09–0036

\* \* \*

The Grand Jury charges FRANK COLE WHALEN, JR. with the following offense, a felony, MURDER IN THE FIRST DEGREE in violation of Title 11, Section 636(2) of the Delaware Criminal Code.

FRANK COLE WHALEN, JR. on the 27th day of August, 1977, in the County of Kent did on North Reed Street, Clayton, Delaware, in the course of and in furtherance of the commission of a rape, a felony, recklessly cause the death of another person, Elva D. Kemp, by strangling her around the neck with his hand or hands.

\* \* \* \* \* \*

Cr. A. No. IK–77–09–0035

\* \* \*

The Grand Jury charges FRANK COLE WHALEN, JR. with the following offense, a felony, RAPE IN THE FIRST DEGREE in violation of Title 11, Section 764(1) of the Delaware Criminal Code.

FRANK COLE WHALEN, JR. on the 27th day of August, 1977, in the County of Kent did intentionally engage in sexual intercourse with a female, Elva D. Kemp, on North Reed Street, Clayton, Delaware, without her consent and in the course of the offense he did inflict serious physical injury upon the victim by choking her around the neck with his hand or hands.

\* \* \* \* \* \*

Cr. A. No. IK–78–03–0029

\* \* \*

The Grand Jury charges FRANK COLE WHALEN, JR. with the following offense, a felony, BURGLARY IN THE FIRST DEGREE in violation of Title 11, Section 826(2) of the Delaware Criminal Code.

FRANK COLE WHALEN, JR. on the 27th day of August, 1977, in the County of Kent did knowingly enter and unlawfully remain in the dwelling of Elva D. Kemp, North Reed Street, Clayton, Delaware, at night, with the intent to commit a crime, rape, therein and when, in the dwelling he did cause physical injury to the said Elva D. Kemp, who was not a participant in the crime.

STATUTES (All applicable statutes are codified in Title 11 of the Delaware Code.):

§ 636. Murder in the first degree; class A felony.

(a) A person is guilty of murder in the first degree when:

(1) He intentionally causes the death of another person;

(2) In the course of and in furtherance of the commission or attempted commission of a felony or immediate flight therefrom, he recklessly causes the death of another person;

(3) He intentionally causes another person to commit suicide by force or duress;

(4) He recklessly causes the death of a law-enforcement officer, corrections employee or fireman while such officer is in the lawful performance of his duties;

(5) He causes the death of another person by the use of or detonation of any bomb or similar destructive device;

(6) He, with criminal negligence, causes the death of another person in the course of and in furtherance of the commission or attempted commission of rape, kidnapping, arson in the first degree, robbery in the first degree, or immediate flight therefrom;

(7) He causes the death of another person in order to avoid or prevent the

lawful arrest of any person, or in the course of and in furtherance of the commission or attempted commission of escape in the second degree or escape after conviction.

(b) Murder in the first degree is a class A felony and shall be punished as provided in § 4209 of this title.

§ 764. Rape in the first degree; class A felony.

A male is guilty of rape in the first degree when he intentionally engages in sexual intercourse with a female without her consent, and:

(1) In the course of the offense he inflicts serious physical, mental or emotional injury upon the victim, or

(2) The victim was not the defendant's voluntary social companion on the occasion of the crime and had not previously permitted him sexual contact.

Rape in the first degree is a class A felony.

§ 826. Burglary in the first degree; class B felony.

A person is guilty of burglary in the first degree when he knowingly enters or remains unlawfully in a dwelling at night with intent to commit a crime therein, and when, in effecting entry or when in the dwelling or in immediate flight therefrom, he or another participant in the crime:

(1) Is armed with explosives or a deadly weapon; or

(2) Causes physical injury to any person who is not a participant in the crime.

Burglary in the first degree is a class B felony.

§ 4209. Punishment, procedure for determining punishment, review of punishment and method of punishment for first-degree murder.

(a) *Punishment for first-degree murder.*—Any person who is convicted of first-degree murder shall be punished by death or by imprisonment for the remainder of his or her natural life without benefit of probation or parole or any other reduction, said penalty to be determined in accordance with this section.

(b) *Separate hearing on issue of punishment for first-degree murder.*—(1) Upon a conviction of guilt of a defendant of first-degree murder, the Superior Court shall conduct a separate hearing to determine whether the defendant should be sentenced to death or to life imprisonment without benefit of probation or parole as authorized by subsection (a) of this section. If the defendant was convicted of first-degree murder by a jury, this hearing shall be conducted by the trial judge before that jury as soon as practicable after the return of the verdict of guilty. Alternate jurors shall not be excused from the case prior to submission of the issue of guilt to the trial jury and shall remain separately sequestered until a verdict on guilt is entered. If the verdict of the trial jury is guilty of first-degree murder said alternates shall sit as alternate jurors on the issue of punishment. If, for any reason satisfactory to the Court, any member of the trial jury is excused from participation in the hearing on punishment, the trial judge shall replace such juror or jurors with alternate juror or jurors. If a jury of 12 jurors cannot participate in the hearing a separate and new jury, plus alternates, shall be selected for the hearing in accordance with the applicable rules of the Superior Court and laws of Delaware, unless the defendant(s) and the State stipulate to the use of a lesser number of jurors.

(2) If the defendant was convicted of first-degree murder by the Court, after a trial and waiver of a jury trial or after a plea of guilty or nolo contendere, the hearing shall be conducted by the trial judge before a jury, plus alternates, empaneled for that purpose and selected in accordance with the applicable rules of the Superior Court and laws of Delaware, unless said jury is waived by the State and the defendant in which case the hearing shall be con-

ducted, if possible, by and before the trial judge who entered the finding of guilty or accepted the plea of guilty or nolo contendere.

(c) *Procedure at punishment hearing.* —(1) The sole determination for the jury or judge at the hearing provided for by this section shall be the penalty to be imposed upon the defendant for the conviction of first-degree murder. At the hearing, evidence may be presented as to any matter that the Court deems relevant and admissible to the penalty to be imposed. The evidence shall include matters relating to any mitigating circumstance and to any aggravating circumstance, including, but not limited to, those aggravating circumstances enumerated in subsection (e) of this section. Notice in writing of any aggravating circumstances and any mitigating circumstances shall be given to the other side by the party seeking to introduce evidence of such circumstances prior to the punishment hearing, and after the verdict on guilt, unless in the discretion of the Court such advance notice is dispensed with as impracticable. The record of any prior criminal convictions and pleas of guilty or pleas of nolo contendere of the defendant or the absence of any such prior criminal convictions and pleas shall also be admissible in evidence.

(2) At the hearing the Court shall permit argument by the State, the defendant and/or his counsel, on the punishment to be imposed. Such argument shall consist of opening statements by each, unless waived, opening summation by the State, rebuttal summation by the defendant and/or his counsel and closing summation by the State.

(3) Upon the conclusion of the evidence and arguments the judge shall give the jury appropriate instructions and the jury shall retire to determine the punishment to be imposed.

(4) In the instructions to the jury the Court shall include instructions for it to weigh and consider any mitigating circumstances or aggravating circumstances and any of the statutory aggravating circumstances set forth in subsection (e) of this section which may be raised by the evidence. The jury shall be instructed to weigh any mitigating factors against the aggravating factors.

(d) *Determination of sentence.*—(1) A sentence of death shall not be imposed unless the jury or judge, where appropriate, finds:

a. Beyond a reasonable doubt at least 1 statutory aggravating circumstance; and

b. Unanimously recommends, after weighing all relevant evidence in aggravation or mitigation which bears upon the particular circumstances or details of the commission of the offense and the character and propensities of the offender, that a sentence of death be imposed. Where the jury, or judge when applicable, submits such a finding and recommendation, the Court shall sentence the defendant to death as provided by subsection (f) of this section. A finding by the jury of a statutory aggravating circumstance, and a consequent recommendation of death, supported by the evidence, shall be binding on the Court.

(2) Refusal or failure of the Court to follow the jury's recommendation for any reason shall be appealable by the State as of right to the Supreme Court within 30 days after imposition of sentence.

(3) If the jury, or judge when applicable cannot unanimously find that at least 1 statutory aggravating circumstance exists and cannot unanimously recommend death, the Court shall sentence the defendant to life imprisonment without benefit of probation or parole.

(e) *Aggravating circumstances.*—(1) In order for a sentence of death to be imposed, the jury, unanimously, or judge when applicable, must find that

the evidence established beyond a reasonable doubt the existence of at least 1 of the following aggravating circumstances which shall apply with equal force to accomplices convicted of such murder:

a. The murder was convicted by a person in, or who has escaped from, the custody of a law-enforcement officer or place of confinement.

b. The murder was committed for the purpose of avoiding or preventing an arrest or for the purpose of effecting an escape from custody.

c. The murder was committed against any law-enforcement officer, corrections employee or fireman, while such victim was engaged in the performance of his official duties.

d. The murder was committed against a judicial officer, a former judicial officer, Attorney General, former Attorney General, Assistant or Deputy Attorney General or former Assistant or Deputy Attorney General, State Detective or former State Detective, Special Investigator or former Special Investigator, during, or because of, the exercise of his official duty.

e. The murder was committed against a person who was held or otherwise detained as a shield or hostage.

f. The murder was committed against a person who was held or detained by the defendant for ransom or reward.

g. The murder was committed against a person who was a witness to a crime and who was killed for the purpose of preventing his appearance or testimony in any grand jury, criminal or civil proceeding involving such crime.

h. The defendant paid or was paid by another person or had agreed to pay or be paid by another person or had conspired to pay or be paid by another person for the killing of the victim.

i. The defendant was previously convicted of another murder or manslaughter or of a felony involving use of, or threat of, force of violence upon another person.

j. The murder was committed while the defendant was engaged in the commission of, or attempt to commit, or flight after committing or attempting to commit any degree of rape, arson, kidnapping, robbery, sodomy or burglary.

k. The defendant's course of conduct resulted in the deaths of 2 or more persons where the deaths are a probable consequence of the defendant's conduct.

l. The murder was committed by means of torture, use of an explosive device or poison, or the defendant used such means on the victim prior to murdering him.

m. The defendant caused or directed another to commit murder or committed murder as an agent or employee of another person.

n. The murder was outrageously or wantonly vile, horrible or inhuman.

o. The defendant was under a sentence of life imprisonment, whether for natural life or otherwise, at the time of the commission of the murder.

p. The murder was committed for pecuniary gain.

q. The victim was pregnant.

r. The victim was severely handicapped, severely disabled or elderly.

s. The victim was defenseless.

(2) In any case where the defendant has been convicted of murder in the first degree in violation of any provision of § 636(a)(2)–(7) of this title, that conviction shall establish the existence of a statutory aggravating circumstance and the jury, or judge where appropriate, shall be so instructed. This provision shall not preclude the jury, or judge where applicable, from considering and finding the statutory aggravating circumstances listed in this subsection and any other aggravating circumstances established by the evidence.

(f) *Method and imposition of sentence of death.*—The imposition of a sentence of death shall be upon such terms and conditions as the trial court may impose in its sentence, including the place, the number of witnesses and conditions of privacy. Punishment of death shall, in all cases, be inflicted by hanging by the neck and such sentence may not be carried out until final review thereof is had by the Delaware Supreme Court as provided for in subsection (g) of this section. The Court or the Governor may suspend the execution of the sentence until a later date to be specified, solely to permit completion of the process of judicial review of the conviction.

(g) *Automatic review of death penalty by Delaware Supreme Court.*—(1) Whenever the death penalty is imposed, and upon the judgment becoming final in the trial court, the recommendation on and imposition of that penalty shall be reviewed on the record by the Delaware Supreme Court. Absent an appeal having been taken by the defendant upon the expiration of 30 days after the sentence of death has been imposed, the Clerk of the Superior Court shall require a complete transcript of the punishment hearing to be prepared promptly and within 10 days after receipt of that transcript he shall transmit the transcript, together with a notice prepared by him, to the Delaware Supreme Court. The notice shall set forth the title and docket number of the case, the name of the defendant, the name and address of any attorney and a narrative statement of the judgment, the offense and the punishment prescribed. The Court shall, if necessary, appoint counsel to respond to the State's positions in the review proceedings.

(2) The Supreme Court shall limit its review under this section to the recommendation on and imposition of the penalty of death and shall determine:

a. Whether, considering the totality of evidence in aggravation and mitigation which bears upon the particular circumstances or details of the offense and the character and propensities of the offender, the death penalty was either arbitrarily or capriciously imposed or recommended, or disproportionate to the penalty recommended or imposed in similar cases arising under this section.

b. Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in subsection (e) of this section and, where applicable, § 636(a)(2)–(7) of this title.

(3) The Supreme Court shall permit the defendant and the State to submit briefs within the time provided by the Court, and permit them to present oral argument to the Court.

(4) With regard to review of the sentence in accordance with this subsection the Court shall:

a. Affirm the sentence of death.

b. In cases where the trial court erroneously rejected the jury's recommendation of the death sentence, remand with directions to reinstate the jury's recommendation and to impose the penalty of death.

c. Set aside the sentence of death and remand for correction of any errors occurring during the hearing and for imposition of the appropriate penalty. Such errors shall not affect the determination of guilt and shall not preclude the reimposition of death where appropriately determined after a new hearing on punishment.

d. Set forth its findings as to the reasons for its actions.

(h) *Ordinary review not affected by section.*—Any error in the guilt phase of the trial may be raised as provided by law and rules of court and shall be in addition to the review of punishment provided by this section.

**§ 3301. Examination upon voir dire in capital cases.**

When a juror is called in a capital case, he shall be first sworn or affirmed upon

 the voir dire and then asked, under the direction of the court, if he has formed or expressed any opinion in regard to the guilt or innocence of the prisoner at the bar. If his answer is in the negative, he shall be sworn as a juror in the case, unless he has conscientious scruples against finding a verdict of guilty in a case where the punishment is death, even if the evidence should so warrant him, or unless he shall be peremptorily challenged, challenged for cause or excused by consent of counsel on both sides. If his answer to the question be in the affirmative, he shall be disqualified to sit in the case, unless he shall say, upon his oath or affirmation, to the satisfaction of the court, that he feels able, notwithstanding such an opinion, to render an impartial verdict upon the law and the evidence, in which event he shall be a competent juror, if not otherwise disqualified, challenged or excused.

## APPENDIX # 2

### DEFENDANT'S REQUEST FOR VOIR DIRE QUESTIONS

\* \* \* \* \* \*

1. Do you understand that an impartial trial by an unbiased jury is a constitutional guarantee no matter what the charges are against the defendant?

2. Do you realize that you are bound to reach a verdict solely on the evidence introduced during the trial?

3. If from your experience you believe or have the feeling that certain facts exist, but these facts have not been proven by satisfactory evidence, would you discard your beliefs or feeling and decide this case only on the evidence or lack of evidence?

4. Do you understand that the comments of the prosecutor and defense attorneys are not evidence in this case?

5. If you are chosen in this case, do you know of any reason why you could not sit as an impartial juror?

6. If you are chosen a juror, will you stand by your opinion based upon the evidence or lack of evidence that comes into the trial?

7. Would you permit anybody to alter that opinion; if you believe that the prosecution has not proved its case beyond a reasonable doubt, will you stick to your opinion?

8. If you are chosen as a juror, and upon the evidence you believe the defendant is innocent, will you stick by that?

9. Are you related to anyone on the Attorney General's staff?

10. Are you related to any police officers?

11. (If yes), what is that relationship?

12. Do you have any friends in the police department or in any other law enforcement agencies?

13. Are you connected with any law enforcement agency?

14. If so, what is the connection?

15. Were you ever connected with any type of law enforcement agency?

16. If so, what was the connection?

17. Do you have any immediate relatives who are connected with any law enforcement agency?

18. Does your job cause you to work with the Delaware State Police?

19. Are you, or is anyone related to you, affiliated with or a member of any auxiliary police organization?

20. Are you a member of any group organized principally for the suppression of crime?

21. Will you give the testimony of a police officer more credence than that of other witnesses merely because he is a police officer?

22. (If supplied with the prosecution witnesses): The following persons will appear as witnesses for the prosecution. (Read their names). Now, are you friendly with or related to any of these people?

23. Do you have conscientious or religious scruples with reference to the infliction of the death penalty?

24. If you do entertain conscientious or religious scruples with reference to the death penalty, will you nevertheless be able to reach an impartial verdict as to innocence or guilt in a case involving the death penalty?

25. Did you know the deceased, Elva Kemp, during her lifetime, or know any members of her family?

26. Were you related in any way to her?

27. Do you believe you can be impartial?

28. Do you know anything about the facts of this case other than what you have heard in court today?

29. Have you read about this case in the newspaper or heard about it over the radio or television? If the answer is "yes", please explain what you recall having read in the newspapers or having heard over the radio or television.

30. Have you formed any opinion as to the guilt or innocence of the accused, or about the merits of this case from what you read in the newspapers?

31. Would you set aside any opinion you may now have and judge this case solely on the evidence introduced during the trial and the instructions of law given to you by the Court?

32. Have you discussed the case with anyone who purports to know the facts and circumstances of the alleged case?

33. Have you heard anybody discussing this case?

34. Have you heard anyone talking about this case before today?

35. Have you heard of this case before today?

36. Since you came here for jury duty, have you seen or heard anything that has led you to form some opinion on this case one way or the other?

37. Have you ever expressed an opinion about this case?

38. Do you realize that the Deputy Attorney General and defense attorneys are all lawyers, equal in the eyes of the law, each doing his best to represent his client?

39. Are you going to give any more weight to the arguments of the prosecutor than to the defense attorney merely because he bears the impressive title "Deputy Attorney General"?

40. Do you now entertain any prejudice against the defendant because of the nature of the crimes charged?

41. Knowing the charge against the accused, could you give him the same fair trial that you would give him if he were charged with lesser crimes?

42. Do you have any quarrel with the basis (sic) concept of American justice that the burden of proving the case beyond a reasonable doubt is always upon the prosecution and remains with it during the entire trial?

43. Will you follow the Court's instructions as to the applicable law, whether you agree with that law or not?

44. After hearing all of the evidence, and after listening to my charge as to the law, if you have a reasonable doubt as to defendant's guilt, will you vote to acquit him because of that reasonable doubt?

45. Will you follow the Court's instructions as to what constitutes reasonable doubt?

46. Would you judge this case solely on the evidence before you, and not allow the fear of later criticism to affect your verdict?

47. In deciding whether or not you are going to believe a witness, would you consider the witness' conduct on the stand, his opportunity and ability to observe, his bias and prejudice, and the probability or improbability of his story?

48. Do you think you have a duty to listen with an open mind to all the people who speak from the witness stand?

49. Do you understand that a man is presumed innocent until he is proven guilty beyond a reasonable doubt?

50. Do you understand that you must give the defendant the benefit of this presumption of innocence without any mental reservations whatsoever? And that you are

to consider this presumption of innocence as actual proof of innocence until it is overcome by proof of guilt beyond a reasonable doubt? Will you give the defendant the full benefit of that presumption of innocence?

51. Do you understand that it is not the defendant's duty to prove himself innocent?

52. Would the fact that the defendant has been arrested and charged with these crimes create an impression in your mind that he must be guilty or else he wouldn't have been held for trial?

53. Do you understand that a defendant has no obligation to prove, or disprove, any fact, but may remain silent?

54. Do you understand that all the elements of the crimes charged must be proven beyond a reasonable doubt, and that if one element is not proven, would you then vote not guilty?

55. Do you agree that you are enforcing the law just as vigorously by voting for acquittal if there is a reasonable doubt as to guilt as you do by voting for conviction when there is no such doubt?

56. Have you, or a relative or close friend of yours, ever been the victim of a crime? If so:

(a) Where and when and what type of crime?

(b) Following the crime, were you interviewed by any member of a law enforcement agency?

(c) Was there a prosecution of the offense?

(d) What was the result?

(e) Were you satisfied that a just result was achieved?

57. Would the fact that the victim is an older person make it difficult for you to render an impartial verdict?

58. Would the nature of the offenses charged in this case make it difficult for you to render an impartial verdict?

### APPENDIX # 3

Ms. Mullen: In addition before the jury selection, we would like to put on the record we did make a request to personally examine the jurors on voir dire in light of the seriousness of the charges, the severity of the possible penalties which attach should the defendant be convicted, the extensive pretrial publicity surrounding the case and other factors. The defendant does feel that his counsel should be afforded an opportunity to personally examine the prospective jurors. The Court has already indicated that in light of earlier Supreme Court rulings that will not be done in this case.

We also want to put on the record our objection to the Court's decision not to ask a significant number of the voir dire questions we submitted.

THE COURT: They will be put in the file.

\*　　\*　　\*　　\*　　\*　　\*

THE COURT: All right. Ladies and gentlemen, I am going to ask some questions and I want to take this time to tell you how we are going to proceed. Do not respond to any of these questions until I have finished asking all of them. There are quite a number of them. After I finish asking these questions, we are going to recess Court. Those of you who have affirmative responses to any question will then come up quietly and quickly and give your name to the clerk. Do not discuss the matter with the clerk, just simply give her your name. We will then have the jury selection in another courtroom. You will remain in this courtroom. You will be called one at a time and you will be questioned further in another courtroom.

Here are the questions:

If you are chosen in this case, do you know any reason why you could not sit as an impartial juror?

Are you related to anyone on the Attorney General's staff?

Are you related to any police officer?

Do you have any friends in the police department or in any other law enforcement agencies?

Are you connected with any law enforcement agency?

Were you ever connected with any type of law enforcement agency?

Do you have any immediate relatives who are connected with any law enforcement agency?

Does your job cause you to work with the Delaware State Police?

Are you, or. is anyone related to you, affiliated with or a member of any auxiliary police organization?

Are you a member of any group organized principally for the suppression of crime?

The following are potential witnesses in this case: Sergeant Robert Collison, Lieutenant Paul Loder, Sergeant William Sipple, Trooper Richard Ogden, Trooper First Class Steve Daugherty, Chief Thomas Bowers, Bruce Dadswell, Robert Berghorn, David Sockrider, Corporal Lawson, Sergeant John Perry, Detective John Bisbee, Dr. Judith Tobin, Rhoda Harris, Kevin Skaggs, Fred Hart, Mrs. Gertrude Richardson, Mr. Albert Regener, Mrs. Albert Regener, Mr. William Whalen, Mrs. William Whalen, Virginia Graham, Mr. Eugene Noll, Mrs. Eugene Noll, Betty Jane Noll—those names are spelled N-o-l-l—Harold Knotts, Jr., Diane Whalen, Eleanor Davis, Daniel Glenn Davidson, Wells Faries, Wells Faries, Jr., Keith Parsell, Fred Englert, Margaret E. Jones, Sandi Burris, Carston Wagner, Cole Faries. The question is: Is any member of the panel related to or a close friend of any of those prospective witnesses?

The attorneys in this case are Nancy Jane Mullen and Dallas Winslow for the defendant; Jane Brady and Kenneth Abraham for the State. Is any member of the panel related to or a close friend of or have you ever been represented by any of those attorneys?

Did you know the deceased, Elva Kemp, during her lifetime or know any members of her family?

Were you related in any way to her?

Those are the questions. Any member of the panel who has an affirmative response to any of them will come forward, after we recess, and give their name to the clerk.

MR. ABRAHAM: May we approach the bench, Your Honor?

THE COURT: Yes.

(Side bar conference not reported.)

THE COURT: I have a further list of potential witnesses: Thomas C. Deacon, Randy Noll, Edward Starkey, John Schallenberger, James Hairgrove, Wally Hudson, Gladys McGinnis, Ruby Sylvester, Reverend Robert Harris, Reverend Chapman, Mr. and Mrs. James Willard Mitchell, Mr. and Mrs. Frank C. Whalen, Sr., Dr. Bjornson, Mrs. Frank C. Whalen, Jr.

There is one further thing you should know. The trial of this case may take two weeks. Is there any reason, in light of this, why you cannot serve as a juror in this case?

Now, those of you who have an affirmative response to any question that I have asked will give your name to the clerk. Come up quietly and quickly.

We will stand in recess.

(Forty-one people responded to the voir dire questions.)

(A recess was here taken.)

APPENDIX # 4

DELAWARE STATE POLICE
POLYGRAPH UNIT

PLACE DSP TROOP #3 DATE 30 AUG 77

I, · FRANK COLE WHALEN JR , DO HEREBY VOLUNTARILY REQUEST AND AUTHORIZE

 CPL. JOHN BISBEE TO CONDUCT A POLYGRAPH EXAMINATION UPON ME AND TO

PROCEED WITH THE EXAMINATION. I FURTHER SPECIFICALLY WAIVE ANY AND ALL

RIGHTS TO PRIVACY THAT I HAVE, OR MAY HAVE, WITH REFERENCE TO THE TAKING OF SUCH AN EXAMINATION.

THE FOLLOWING ARE MY CONSTITUTIONAL RIGHTS WHICH I SHALL READ AND ANSWER IN MY OWN HANDWRITING;

1. I HAVE THE RIGHT TO REMAIN SILENT AND DO NOT HAVE TO SAY ANYTHING UNLESS I CHOOSE TO TALK. I UNDERSTAND [initialed by defendant]
2. I HAVE THE RIGHT TO TALK TO A LAWYER BEFORE I SUBMIT TO A POLYGRAPH EXAMINATION. I UNDERSTAND [initialed by defendant]
3. IF I CANNOT AFFORD A LAWYER, THE COURT SHALL APPOINT ONE TO REPRESENT ME WITHOUT COST TO ME. I DO NOT HAVE TO ANSWER ANY QUESTIONS UNTIL MY LAWYER IS APPOINTED AN HE ADVISES ME. I UNDERSTAND [initialed by defendant]
4. I AM WILLING TO ANSWER ANY QUESTIONS DURING THE POLYGRAPH EXAMINATION AND KNOW THAT I HAVE THE RIGHT TO STOP ANSWERING ANY QUESTIONS AT ANY TIME I WISH. I UNDERSTAND [initialed by defendant]
5. I FURTHER REALIZE THAT ANYTHING I SAY DURING THIS POLYGRAPH (LIE-DETECTOR) EXAMINATION MAY OR CAN BE USED AGAINST ME, OR ANYONE ELSE, IN THE EVENT OF A COURT PROCEEDING. I UNDERSTAND [initialed by defendant]

I FULLY UNDERSTAND THE ABOVE STATEMENTS OF MY RIGHTS. I AM WILLING TO ANSWER ALL QUESTIONS AND MAKE ANY STATEMENT I MAY WANT TO GIVE. I DO NOT WANT A LAWYER. I UNDERSTAND AND KNOW WHAT I AM DOING. NO PROMISES OR THREATS HAVE BEEN MADE TO ME AND NO PRESSURE OF ANY KIND HAS BEEN USED AGAINST ME TO SUBMIT TO THIS EXAMINATION.

I HEREBY AUTHORIZE THE DELAWARE STATE POLICE TO DISCLOSE, BOTH ORALLY AND IN WRITING, THE RESULTS AND OPINIONS OF THIS POLYGRAPH EXAMINATION TO ALL INTERESTED PERSONS. I FURTHER UNDERSTAND THAT SUCH RESULTS AND OPINIONS MAY PROVE UNFAVORABLE TO ME. FULLY UNDERSTANDING THIS, I RELEASE AND FOREVER HOLD FREE FROM ALL HARM, LIABILITY, OR DAMAGE TO ME AS A RESULT OF THIS POLYGRAPH EXAMINATION, RESULTS AND OPINIONS, THE STATE OF DELAWARE, TOGETHER WITH ITS OFFICERS AND EMPLOYEES.

WITNESS _____ SIGNED [signed by defendant]_____

_____

## SUPPLEMENTAL OPINION

Defendant has filed a motion for reargument requesting the Court to reconsider the holding in Section II that appellant waived his *Miranda* rights. In making our earlier ruling on this issue we fully considered the arguments raised by counsel in the present motion; therefore, we decline to reconsider this issue. Defendant also seeks instructions regarding the procedure to be employed in the Superior Court on remand for a new penalty hearing pursuant to Section IX. Specifically, defendant requests that we rule on the question of whether such hearing must be held before the original jury in this case or whether a new jury may be drawn to hear and decide the penalty issue. We have determined that this question should, in the first instance, be presented to the Superior Court for resolution. Therefore, we deny the motion for reargument *in toto*.

 There is, however, one final issue which it is now appropriate for the Court to address further. In Section VIII B, we reserved for decision the question of whether federal double jeopardy principles prohibit defendant's separate convictions and sentences for Felony Murder and the underlying felony of Rape First Degree. We had already held, in Section VIII A, that the

Legislature intended to authorize such separate convictions and sentences. However, we deferred answering the double jeopardy question pending the outcome on the State's petition for certiorari to the United States Supreme Court in *Hunter v. State*, Del.Supr., 420 A.2d 119 (1980). The petition was granted, and that Court vacated this Court's judgment and remanded the case for further consideration in light of *Albernaz v. United States*, 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981). *Delaware v. Hunter*, 450 U.S. 991, 101 S.Ct. 1689, 68 L.Ed.2d 190 (1981). On remand this Court reversed its earlier holding in *Hunter* concluding "that where the General Assembly intended . . . to impose multiple punishments for two offenses not satisfying the *Blockburger* test, imposition of two consecutive sentences as a result of a single trial does not violate the Double Jeopardy Clause of the Fifth Amendment." *Hunter v. State*, Del.Supr., 430 A.2d 476, 481 (1981).*

Thus, according to *Hunter II*, the Legislature's intention to authorize multiple convictions and sentences for the Felony Murder and the underlying Rape First Degree offenses in this case is determinative of the federal double jeopardy question. Therefore, our determination in Section VIII A that the Legislature did intend to authorize the convictions and sentences imposed in this case necessarily answers defendant's double jeopardy argument, and we hold that imposition of multiple sentences upon defendant for the Felony Murder and the Rape First Degree in this case does not violate the Double Jeopardy Clause as interpreted in *Albernaz v. United States, supra.*

The reservation of jurisdiction is vacated, and the case is hereby REMANDED to the Superior Court for further proceedings consistent herewith.

---

* The reference in this quote is to the test established for determining legislative intent found in *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932).