**Robert J. MARTIN, Jr., Richard F. Massey, Defendants Below, Appellants,**

v.

**STATE of Delaware, Plaintiff Below, Appellee.**

Supreme Court of Delaware.

Submitted April 14, 1980.

Decided March 5, 1981.

Supplemental Opinion July 14, 1981.

Eugene J. Maurer, Jr. (argued), John M. Willard and Richard E. Fairbanks, Jr., Asst. Public Defenders (argued), Wilmington, for defendants below, appellants.

Norman A. Barron, Deputy Atty. Gen. (argued), and Charles M. Oberly, III, State Prosecutor (argued), Wilmington, for plaintiff below, appellee.

Before DUFFY, McNEILLY and HORSEY, JJ.

McNEILLY, Justice:

Defendants, Robert J. Martin, Jr. and Richard F. Massey appeal their convictions and sentences on charges of Murder First Degree, Robbery First Degree, Burglary Second Degree, Conspiracy Second Degree, and three counts of Possession of a Deadly Weapon during the Commission of a Felony. The charges stem from the murder of Mrs. Nancy Repman in the Repman home at Greenville, Delaware.

The defendants have raised ten basic arguments including sixty-two supporting reasons why their convictions should be reversed. We consider those arguments and supporting reasons *seriatim*, affirming in part and reversing in part.

I

On November 8, 1977, Martha Repman, the daughter of Mrs. Nancy Repman, had prearranged to visit her mother at the Repman home in Greenville, Delaware, an af-

fluent residential suburb of Wilmington. Martha telephoned her mother at 10:30 a. m. to say that she would be late. At approximately 2:15 p. m. Martha arrived at her mother's home, entered and found her mother lying face down on the floor in the sitting room off her parents' bedroom. After calling an ambulance and her father's office, Martha noticed that the house was in disarray, that the back door was propped open, and that some of her father's collection of antique guns were missing. Martha also noticed blood on her mother's face, but not until Dr. Harry Repman, husband of the victim Nancy Repman, returned home after being summoned by his daughter, Martha, was it determined that Mrs. Repman was dead. Nancy Repman had been killed by a close range shot into the back of her head fired by the murderer from a .357 magnum handgun taken from the bedside table of her son, Fred Repman, who lived at home with his parents at the time. This pistol was later recovered during the arrest of defendant Martin in Cincinnati, Ohio, and was identified by an F.B.I. agent, expert in the ballistics field, as the murder weapon. Dr. Repman inspected the house and informed the police officers that a large quantity of antique rifles were missing, as well as some jewelry and antique coins. On November 15, 1977, a fisherman found a number of antique guns in a river at Parvin State National Park in Franklin Township, New Jersey. These were turned over to the New Jersey State Police and subsequently identified by Dr. Repman as having come from his collection.

The initial investigating police officers at the crime scene undertook a thorough inspection of the Repman residence. Approximately twenty latent fingerprints were lifted from a gun case and the propped-open back door; however, neither defendant's fingerprints matched those obtained at the crime scene. There were no signs of forcible entry. However, the police noted that mattresses had been thrown on the floor and that the house had been ransacked. The investigating officers were unable to determine how many people were involved in the crime.

Earlier on the day of the crime, at approximately 10:00 a. m., a man displaying a Florida driver's license in the name of William Besaro rented a Hertz van from Wilmington Truck Rental. The employee who rented the van testified that the rental customer arrived in a brown foreign sports car with New Jersey license plates driven by another person. At trial Rhonda Willis, a friend of both defendants, testified that she had stolen a Florida driver's license belonging to William Besaro and had given it to defendant Martin prior to November 8, 1977, and that shortly after the Repman murder Martin told her that he had destroyed the license. The same rented van was found at approximately 3:30 p. m. on November 8 in a wooded area in Franklin Township, New Jersey. Although the van had been set on fire, the police were able to recover an oriental rug from the van which was later identified as being from the Repman home.

Mrs. Delores DeFelice, the sister of defendant Massey, testified extensively at the trial. Mrs. DeFelice lived in Elm, New Jersey, with her husband and children; defendant Massey also had his own bedroom in the house. At approximately 1:30 p. m. on November 8, Mrs. DeFelice found the defendants sitting in her kitchen and observed a truck with a Delaware license plate in back of the house containing what appeared to be some old wood and rugs. Shortly thereafter the defendants left, one driving the truck and one driving defendant Massey's orange Datsun sports car with New Jersey plates. After the defendants left, Mrs. DeFelice went down to her basement and found approximately seventy-five "old guns," i. e., rifles, with tags attached to them. When defendant Massey returned to the house later that night, Mrs. DeFelice ordered him to remove the guns.

Two days later, on November 10, 1977, Mrs. DeFelice again spoke with defendant Massey about the guns after she had read a Delaware newspaper article about the Repman murder. Massey told her that his involvement in the incident was limited to transporting the stolen guns and that he

had not hurt Mrs. Repman. Massey told his sister that he had not even been in the Repman house but had waited, during the actual burglary and murder, out on a highway near the house for his compatriots to drive out with the loaded van. The following evening the defendants removed the guns from the DeFelice home.

On November 15, 1977, at approximately 3:00 a. m., police officers conducted a search of the DeFelice house pursuant to a warrant obtained in New Jersey. A dragoon belt and chain tag, later identified as being from the Repman home, were seized. Mrs. DeFelice was taken to a local police station where, at approximately 4:30 a. m., she gave a statement concerning her knowledge of the crimes. She stated that defendant Massey told her that he had not killed Mrs. Repman and that Mrs. Repman was killed because "they" had been surprised by the victim. Mrs. DeFelice further stated that defendant Massey told her that he was outside the Repman house at the time of the killing. On January 30, 1978, Mrs. DeFelice gave a further statement at the Delaware Attorney General's office in which she corrected some details in her prior statement. She then stated that defendant Massey told her that he was outside the Repman house at the time of the killing and that two persons other than himself and defendant Martin were involved in the crimes. These statements were read into evidence at the trial.

At approximately 11:30 a.m. on November 15, defendant Massey was arrested in Delaware by a New Castle County Police officer. Massey's car, an orange Datsun sports car with New Jersey plates, was impounded. The following day the car was searched pursuant to a warrant, and two rings, later identified as having belonged to the victim, were seized. Also on November 16, defendant Massey was interrogated by State Prosecutor Charles M. Oberly, III. Mr. Oberly testified at the trial that Massey admitted he was "there" at the time of the crimes but claimed he was not in the Repman house at the time of the killing. Mr. Oberly also testified that, in response to his question as to why the Repman house was selected, Massey stated that "we had information that there were guns" at the house. Lastly, Massey told Mr. Oberly that the matters contained in Mrs. DeFelice's statement were true.

Defendant Martin led the authorities on a more extended search. Sometime after November 15, Rhonda Willis, the defendants' friend mentioned earlier, received a message to pick up two guns and some coins. Willis took one of the guns to defendant Martin who was staying at a motel in Pennsylvania. In the early morning hours of November 25, 1977, an officer of the New Castle County Police Department, having received information that defendant Martin was then at a specified motel in Cincinnati, Ohio, telephoned the Cincinnati Police Department and requested that the lead be investigated. Several Cincinnati Police officers proceeded to the motel and arrested Martin without a struggle. The police then searched Martin's room and seized several items found secreted in a toilet tank. These items included a quantity of coins and .38 caliber bullets, the .357 magnum pistol stolen from the Repman home and later identified as the murder weapon, and a business card labeled "Kennedy & Kennedy" with the Repman's telephone number inscribed on the back.

Both Martin and Massey testified at the trial. Defendant Martin admitted renting the van on the morning of November 8, 1977, and turning it over to a man named Tony, who Martin knew through prior drug dealings. The Repman burglary was first raised at one such meeting in October, 1976, after which the men drove to view the Repman house. Martin testified that during this trip he wrote the Repman telephone number on the back of the business card later seized by the police during his arrest in Cincinnati. Over the following months Martin and Tony had several other discussions about the Repman job. It was agreed that Tony and his friends would do the actual burglary while Martin would arrange for the transportation, storage and sale of the stolen goods. During this period Martin arranged with Massey to store the stolen goods at the DeFelice house.

On the morning of November 8, 1977, in accordance with their prearranged plan, Martin and Massey rented the van and, at 11:00 a. m., met with Tony in the parking lot of a Wilmington restaurant. Tony took the van and told the defendants that he would telephone them when the burglary was completed, at which time the defendants would retrieve the van along with the stolen goods. After receiving the expected telephone call about one hour later, the defendants returned to the restaurant parking lot, picked up the now-loaded van, and proceeded to the DeFelice house in New Jersey. The defendants then unloaded the stolen goods, took the van to a secluded area and set it on fire.

In his testimony defendant Massey generally corroborated the testimony of defendant Martin as to their involvement in the crimes.

## II

■ Defendants' first argument is that since the jury did not decide which defendant was the principal and which was an accomplice, each of them cannot be found guilty of Murder First Degree under 11 *Del.C.* § 636(a)(2) (if the killing was committed by another person) and 11 *Del.C.* § 271(2) because an individual cannot intend to promote or facilitate the commission of an offense when the state of mind required thereunder is recklessness.[1]

In resolving a similar argument in *Hooks v. State*, Del.Supr., 416 A.2d 189, 197 (1980) this Court said:

"Defendants misconstrue the nature of the intent required. The inquiry under § 271 is not whether each accomplice had the specific intent to commit murder, but whether he intended to promote or facilitate the principal's conduct constituting the offense. The defendants did not have to specifically intend that the result, a killing, should occur. As long as the result was a foreseeable consequence of the underlying felonious conduct their intent as accomplices includes the intent to facilitate the happening of this result."

1. The pertinent portions of all statutes referred to herein may be found in *Appendix # 1, infra.*

Here defendants were engaged in a burglary at the Repman residence in the daytime. A car was in the garage, the front door was unlocked, a television set was on. A purpose of the burglary was to steal weapons. Clearly under such circumstances the defendants intended to promote or facilitate any offenses committed in the course of or in the furtherance of the burglary which were in the foreseeable range of consequences, in this case murder. Defendants' first argument is without merit.

## III

The defendants next attack several of the separate sentences imposed by the Trial Court as violative of the Double Jeopardy Clause of the Fifth Amendment. In one argument the defendants contend that they could not be separately sentenced for the three weapon offenses and the underlying felonies in these cases. Additionally, they contend that they could not be separately sentenced for both Murder First Degree (Felony Murder) and the underlying felony of Burglary Second Degree. We treat each of these arguments separately.

### A

The defendants assert that our recent decisions in *Davis v. State*, Del.Supr., 400 A.2d 292 (1979), and *Hunter v. State*, Del. Supr., 420 A.2d 119 (1980), preclude their convictions and sentences for both Possession of a Deadly Weapon During the Commission of a Felony, 11 *Del.C.* § 1447, and the underlying felonies of Murder First Degree, 11 *Del.C.* § 636(a)(2), Burglary Second Degree, 11 *Del.C.* § 825(1), and Robbery First Degree, 11 *Del.C.* § 832(a)(1). We agree that under the rationale of *Hunter* the sentences imposed on these convictions may not stand and, therefore, the cases must be remanded for resentencing.

Initially, we note that the legislative history and intent analysis found in *Davis v. State, supra,* a Robbery First Degree case, is clearly inapplicable to the murder and

burglary offenses in this case. Moreover, in *Davis* we were concerned with the relationship between § 1447 and that subsection of the Robbery First Degree statute which requires possession of a deadly weapon during the commission of a Robbery Second Degree, § 832(a)(2). Here the robbery offenses for which the defendants were convicted are defined by § 832(a)(1) which requires physical injury to a nonparticipant in the crime during the commission of a Robbery Second Degree. Consequently, *Davis* is also inapplicable to the instant robbery offenses, since it cannot be said that § 832(a)(1) contains "precisely the same elements as the weapons statute." 400 A.2d at 296.

However, as *Hunter v. State, supra,* makes clear, we must independently review the statutes defining the instant offenses, as well as other indicia of legislative intent, to ascertain whether the Legislature did intend to authorize multiple convictions and sentences for such offenses. Unlike in *Davis v. State, supra,* there is no virtual identity of offenses as between § 1447 and the instant underlying felonies, since only § 1447 requires possession of a deadly weapon. Moreover, the societal interest sought to be advanced by § 1447, *i.e.,* to discourage the presence of deadly weapons during the commission of felonies so as to reduce the likelihood of serious physical injuries to persons, is entirely separate and distinct from those sought to be protected by the underlying felony statutes here involved. The murder statute seeks to protect human life; the robbery statute seeks to protect against forcible theft of property; the burglary statute seeks to protect the integrity of personal dwellings from intrusion by those

with a criminal purpose. *Compare Whalen v. State,* Del.Supr., 434 A.2d 1346 (1980). Lastly, at least where the underlying felonies do not themselves require possession of a deadly weapon, see *Davis v. State, supra,* § 1447(c) clearly contemplates the allowance of multiple convictions and the imposition of separate sentences thereon. These considerations lead us to conclude that the Legislature did intend to authorize the multiple convictions and sentences in these cases.[2]

The final step in our *Hunter* analysis is to determine whether, regardless of the Legislature's intent, the instant sentences violate the prohibition against double jeopardy. Applying the *Blockburger*-like [3] test adopted in *Hunter,* we hold that multiple punishments for the "same offense" have thrice been imposed upon each defendant, because each of the underlying felonies of murder, burglary and robbery [4] required proof of no fact not required by the § 1447 offenses. See also *Evans v. State,* Del.Supr., 420 A.2d 1186 (1980).

As in *Hunter,* double jeopardy principles are not offended by the instant convictions which were obtained in a single prosecution of each defendant. However, the multiple sentences imposed on these convictions may not stand, and the cases must be remanded for resentencing in accordance with *Hunter* and *Evans v. State.*[5]

B

The defendants also argue that the imposition of separate sentences upon them for Murder First Degree (Felony Murder) and the underlying felony of Burglary Second Degree is in violation of the Double Jeopardy Clause. Essentially this argument seeks

---

**2.** These same considerations lead us to conclude that the instant underlying felonies are not lesser included offenses of § 1447 for the purpose of applying 11 *Del.C.* § 206(a)(1). *Compare Whalen v. State, supra.*

**3.** *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932).

**4.** The Federal District Court has opined in dicta that multiple sentences in a single prosecution for a § 1447 offense and Robbery First Degree under § 832(a)(1) "pose no double jeopardy

problem...." *United States ex rel. Stewart v. Redman,* D.Del., 470 F.Supp. 50, 55 (1979). Based on the foregoing analysis, we disagree.

**5.** The dissenters in *Hunter v. State* continue to adhere to the position there expressed. See *Evans v. State, supra* (Quillen, J., and McNeilly, J., concurring). Therefore, Justice McNeilly concurs in the result reached in Section III A, *supra,* solely on the basis of *stare decisis.* See *id.*

to extend the *Hunter* analysis into the Felony-Murder/underlying-felony context, despite this Court's allowance of separate sentences for both crimes in the past. See *Jenkins v. State*, Del.Supr., 240 A.2d 146 (1968), *aff'd*, 395 U.S. 213, 89 S.Ct. 1677, 23 L.Ed.2d 253 (1969). Although the defendants' position has arguable merit, see *Whalen v. State, supra*, we believe that it is prematurely raised, given our decision in Section III A, *supra*, and, therefore, we decline to reach the question in these cases.

Our analysis in Section III A requires *inter alia* that as to each defendant the sentences for two counts of Possession of a Deadly Weapon During the Commission of a Felony and for the corresponding underlying felonies of Murder First Degree and Burglary Second Degree be vacated. On remand the State will be required to have each defendant resentenced: (1) on either the conviction for Possession of a Deadly Weapon During the Commission of a Felony or the underlying felony of Murder First Degree, not both; and (2) on either the conviction for Possession of a Deadly Weapon During the Commission of a Felony or the underlying felony of Burglary Second Degree, not both. See *Hunter* and *Evans v. State, supra*. Thus, given the State's right of election on remand, it is not at all certain that either defendant will ultimately receive a separate sentence for either or both Murder First Degree (Felony Murder) and the underlying felony of Burglary Second Degree. In effect, our holding in Section III A has, for the time being, rendered the Felony Murder double jeopardy issue moot. In the event that the State breathes new life into this issue, by electing to have either defendant resentenced on both the Murder First Degree conviction and the Burglary Second Degree conviction, there will be ample opportunity for this Court to address the double jeopardy issue on appeal after resentencing.

## IV

■ Defendants contend that the Trial Judge erred in admitting into evidence, under the inevitable discovery exception to the exclusionary search and seizure rules, a .357 magnum revolver found in a toilet tank in a Cincinnati, Ohio motel room occupied by defendant Martin.

This Court approved the inevitable discovery exception in *Cook v. State*, Del. Supr., 374 A.2d 264 (1977). As Chief Justice Herrmann stated therein:

"This exception, which has found increasing judicial favor, provides that evidence, obtained in the course of illegal police conduct, will not be suppressed if the prosecution can prove that the incriminating evidence 'would have been discovered through legitimate means in the absence of official misconduct.' "

374 A.2d at 267–68 (citations omitted).

In this case the State concedes the illegality of the search. But the Trial Court, following an evidentiary suppression hearing, found that the State had met its burden of establishing that inevitably the revolver would have been discovered.

The testimony established that this burglary/homicide case was extremely complex, and the leads involved therein had been followed in all directions. For example, a search warrant was obtained for the New Jersey residence of defendant Massey's sister in spite of her cooperation with the police. Another search warrant was obtained before defendant Massey's impounded car was searched.

Further, Detective McGaughan of the Delaware State Police who travelled to Cincinnati with another officer and a deputy attorney general after defendant Martin was arrested, testified that he would have sought a search warrant before searching the motel room occupied by defendant Martin had not the Cincinnati police already conducted a search without a warrant.

In this regard it is also important to note that the motel manager testified that while changing the sheets after defendant Martin's arrest, a maid had noticed a slit in the mattress and had found a holster therein. She turned the holster over to the manager who telephoned the police. He testified that had the police so requested he would

have given them permission to search the then vacant room.

It appears from the record of the suppression hearing that the police undertook a "saturation investigation," that is "one in which the police might be expected as a matter of course to make an unusually thorough investigation utilizing more available avenues or techniques than they ordinarily might." LaCount and Girese, *The "Inevitable Discovery" Rule: An Evolving Exception to the Constitutional Exclusionary Rule,* 40 Alb.L.Rev. 483, 495 (1976). We are satisfied that the State has met its burden under *Cook* and that defendants' argument on this point is without merit.

**V**

■ Defendants contend that the out-of-court statements made by Delores DeFelice, defendant Massey's sister, were improperly admitted into evidence under 11 *Del.C.* § 3507 because they were involuntarily obtained. In the recent case of *State v. Rooks,* Del.Supr., 401 A.2d 943 (1979), this Court delineated the requisite factors which must be considered in determining the voluntariness of out-of-court statements of

prospective criminal case witnesses. The State's burden is to prove by a preponderance of the evidence that under the "totality of circumstances" the witness' statements were the product of a rational mind and free will. The Trial Judge must focus his attention on a "totality of the circumstances" overview of the behavior of the interrogators, as well as the mental/physical makeup of the individual being interrogated, to determine whether the individual's will was so overborne that the statements produced were not the product of a rational intellect and free will.

In this case the defendants contend that Mrs. DeFelice's statements were induced: by fear for her brother's safety in the event she did not submit to questioning; by the presence at her home at 3:00 a. m. of numerous Delaware and New Jersey police officers and a Delaware deputy attorney general; by the fact that she was hysterical, and also because she was suffering from the lack of post operative medication.

■ The Trial Judge, after considering all the evidence presented at a suppression hearing, found that the State had sustained its burden of establishing voluntariness.[6]

---

**6.** In his letter opinion, the Trial Judge wrote:
"Mrs. DeFelice's first statement was made at a time when she was concededly upset. It occurred at approximately 4:30 A.M. after the police had entered her house with a search warrant and after a number of disturbing incidents had occurred involving her brother, the defendant Richard F. Massey. Additionally, Mrs. DeFelice had been on medication for sometime, had recently undergone surgery and had had difficulty sleeping for some period of time.

"These matters, together with other circumstances of the moment reflected in the record, would have naturally been upsetting to Mrs. DeFelice. The Court believes, however, that the test of voluntariness of a statement is not simply whether or not the individual is upset but rather the cause of the upsetness and, ultimately, whether or not the statement was made voluntarily in spite of being upset. Being upset is merely one factor to be considered by the Court in determining whether or not a statement was voluntarily made.

"In this instance, after hearing extended testimony and argument, the Court has concluded that Mrs. DeFelice, even though extremely upset, was, nevertheless, anxious to make a statement hoping that it would in some way help

her brother and/or her family. There is nothing in the record to reflect that Mrs. DeFelice was misled by any State representatives in this regard. Mrs. DeFelice was not only anxious to make a statement but even turned down an opportunity to make a statement at a later date, going, in spite of the hour, to the local police station where the statement was recorded. Additionally, a number of days elapsed before the transcribed copy of the statement, first having been provided to Mrs. DeFelice, was signed by her after she had made a journey of some distance from her home in New Jersey to Delaware accompanied by her attorney. The Court is satisfied that the totality of the circumstances here involved leads to the inevitable conclusion that Mrs. DeFelice, an intelligent, perceptive young woman, without undue influence by the State voluntarily made the statement in question and signed the transcription thereof after due and deliberate consideration. The State, beyond any doubt, sustained its burden of establishing voluntariness.

"The subsequent or second DeFelice statement was made some months later and again was made, in the Court's judgment, voluntarily. The second statement was an aftermath of the first statement and was precipitated by Mrs.

This Court will not disturb conclusions of fact made by the Trial Judge when supported by competent evidence. In this case clearly there was competent evidence to support the Trial Judge's conclusions and the admissions of the DeFelice statements.

## VI

■ Defendants contend the warrant authorizing the search of defendant Massey's automobile was issued on the basis of an affidavit which, when read in its entirety, failed to establish probable cause that seizable property could reasonably be found in defendant's automobile. *Edwards v. State,* Del.Supr., 320 A.2d 701 (1974); *Rossitto v. State,* Del.Supr., 234 A.2d 438 (1967).[7]

This Court in *Wilson v. State,* Del.Supr., 314 A.2d 905, 906–07 (1973), set forth the tests of sufficiency for the issuance of a search warrant based upon a common sense determination by the issuing official:

"A search warrant can be legally issued only upon an affidavit establishing sufficient grounds for the warrant. The affidavit must state facts constituting probable cause to search; i.e., facts sufficient to warrant a reasonable man in the belief that seizable property would be found in a particular place or on a particular person. *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1924).

"The affidavit can establish probable cause either by setting out the incriminating personal observations of a reliable affiant (usually a police officer who is presumptively reliable), or it may be based on incriminating reports to the affiant by some informer or third party witness; i.e. hearsay. If the affidavit is based on hearsay, it must contain reasonable corroboration of the hearsay reports. Under the two-fold standard set out in *Aguilar v. Texas,* 378 U.S. 108, 114, 84 S.Ct. 1509, 1514, 12 L.Ed.2d 723 (1964), this means (1) that the magistrate must be satisfied that the affidavit reveals the underlying circumstances from which the informant drew the conclusion that criminal activity had occurred; and (2) that there are sufficient reasons for believing that the informant's information is reliable."

After a careful reading of the "affidavit and application for Search Warrant" we are satisfied that the *Wilson* tests were met.

## VII

The State concedes in its brief that defendant Martin was entitled to a jury trial on his two convictions for criminal contempt arising out of certain trial conduct. The State also does not oppose setting aside the contempt convictions and sentences with a remand for purposes of allowing the State the opportunity to prosecute said charges in the normal manner.

## VIII

Defendant Martin contends that the Trial Judge abused his discretion in denying Martin's motion for a continuance thereby depriving him of effective assistance of counsel.

Following his arrest on November 25, 1977 in Cincinnati, Ohio, defendant Martin privately retained Arlen Mekler, Esquire. In April of 1978 Mr. Mekler was permitted to withdraw as counsel because defendant Martin was unable to obtain funds for legal services rendered. It was defendant Martin's "emphatic desire" that Mr. Mekler be permitted to withdraw. The Trial Court permitted Mr. Mekler to withdraw, and on April 11, 1978, appointed James Rambo, Esquire, a relatively inexperienced attorney.

On the day of his appointment Mr. Rambo wrote to Mr. Mekler requesting a conference and opportunity to review Mr. Mek-

---

DeFelice's desire to make some corrections or changes in the original statement. There is nothing in the record to reflect that the State in any way either misled Mrs. DeFelice or placed

her under any undue pressure or duress prior to her making the second statement."

7. See *Appendix # 2* for a copy of the affidavit and application for a search warrant.

ler's case file. Because of the complexities of the case the Trial Judge, on April 25, 1978, appointed Joseph A. Hurley, Esquire, as co-counsel with Mr. Rambo. Mr. Hurley is a former deputy attorney general, a former member of the Public Defender's active staff, and to date is an active criminal lawyer. In spite of the grant of his motion to withdraw, Mr. Mekler continued to represent defendant Martin during the hearing in April on the defendant's motion to suppress Mrs. DeFelice's statements, and, in fact, argued the suppression motion before the Court on May 1, 1978.

Defendant Martin's co-counsel filed a motion for a continuance based upon the time required to interview four to fifteen witnesses, do legal research, retain ballistics and handwriting experts, and examine the crime scene.[8]

Defendant Martin's motion for a continuance was denied on May 4, 1978. Jury selection began on May 15, 1978. Defense counsel viewed the scene on May 19, 1978, and completed interviews on May 27, 1978. The State opened its case on May 27, 1978, rested on June 6, 1978, and Martin's defense commenced on June 9, 1978.

 Absent unreasonable or capricious grounds the Trial Court's ruling on a motion for a continuance will not be disturbed. *Raymond Heartless, Inc. v. State*, Del.Supr., 401 A.2d 921 (1979). We find no abuse of discretion under the facts of this case in the Trial Judge's denial of defendant's motion for a continuance.

## IX

Defendants contend that it was prejudicial and in violation of the Trial Judge's preliminary order sequestering all witnesses for the State Prosecutor to be present during the suppression hearing on the DeFelice statements because he later became a witness.

8. On May 4, 1978 defense co-counsel's motion for the appointment of named experts was granted.

At the commencement of the hearing Mr. Oberly, the State Prosecutor, called Mrs. DeFelice as a state witness and conducted direct examination. During his direct examination, it became apparent to Mr. Oberly that she was changing from a cooperative to an uncooperative witness. Mrs. DeFelice alleged that the statements made by her to Mr. Oberly were made unwillingly because she wanted to call a lawyer, because of her physical condition, and because she did not understand what was happening due to the confusion in her home at the time. Mr. Oberly then stated to the Court that Mrs. DeFelice might be hostile and requested "quite a bit of leeway now to determine whether or not the statement was voluntary." The Trial Judge permitted Mr. Oberly to continue his line of questions, which he did without objection of defense counsel.

Near the end of Mr. Oberly's interrogation of Mrs. DeFelice he pointed out to the Court the possibility of his testifying at trial in light of Mrs. DeFelice's testimony and indicated his intention to withdraw as the prosecutor of the case. Thereafter, the hearing continued with cross-examination of Mrs. DeFelice, following which Mr. Oberly announced his withdrawal and requested permission to ask leading questions because of Mrs. DeFelice's hostility. The hearing was then recessed with the Trial Judge's admonition that the parties not discuss the case with the witness, Mrs. DeFelice.

When the hearing was resumed Deputy Attorney General Norman Barron replaced Mr. Oberly and conducted the re-examination of Mrs. DeFelice and the examination of other witnesses, including the examination of Mr. Oberly on rebuttal.

 No motion was made to prevent Mr. Oberly from testifying nor to strike his testimony as being in violation of the Court's sequestration order. Defendants'

objection now comes too late. *Jenkins v. State*, Del.Supr., 305 A.2d 610 (1973). However, even assuming the objection was timely, the defense has not made the required showing of actual prejudice. *Fountain v. State*, Del.Supr., 382 A.2d 230 (1977); *Derrickson v. State*, Del.Supr., 321 A.2d 497 (1974). The defendants ask this Court to assume that Mr. Oberly's testimony was shaped after hearing the witnesses testify, using his contact with and preparation of the witnesses for trial and his participation in the investigation of the case. The purpose of sequestration is to prevent one witness from shaping his testimony in accordance with testimony given by other witnesses. *Grace v. State*, Del.Supr., 314 A.2d 169 (1973). We cannot say that such is the case here, but neither can we condone Mr. Oberly's continuing in the hearing after it first became apparent that Mrs. DeFelice might become a hostile witness requiring Mr. Oberly to abandon his role as prosecutor and become a witness. Mr. Oberly recognized his ethical duties as lawyer/witness, and he immediately informed the Court of his duty to withdraw. At that time error was committed by permitting Mr. Oberly to continue. We are satisfied, however, that the error was harmless beyond a reasonable doubt.

## X

During his summation to the jury, Deputy Attorney General Norman Barron said:

"Ladies and gentlemen, Richard Massey in November, 1977, was questioned,

'Were you at the Repman residence?

'Answer: Yes, we were there.

'Question: Why was Mrs. Repman killed?

'Answer: Because the three of us were seen.'"

This was a misstatement of the evidence, and counsel for defendants immediately requested a corrective instruction which the Court gave as follows:

"The Court: Members of the jury, before going on, I call your attention to the fact that Mr. Barron has apparently misstated the evidence. The evidence before you from the DeFelice statement was that Mr. Massey said, by way of explaining the death involved, that they were seen. He did not use the term, 'us.'"

Mr. Barron then continued:

"... I can't remember the question, but the answer being,

'We were there.' You will see that in the statement."

Defendants claim that Mr. Barron's misstatement was prejudicial because it completely changed the meaning of the Massey statement from an exculpatory one to an inculpatory one. Both defendants maintained their innocence by claiming peripheral involvement some distance from the scene of the crime. Therefore, they say, there can be no cure to the prejudice created in the jurors' minds by the statement, "the three of us were seen."

We disagree. We are satisfied that the corrective statement made immediately by the Trial Judge was also curative. *Stokes v. State*, Del.Supr., 402 A.2d 376, 381 (1979).

AFFIRMED, in part; REVERSED, in part; REMANDED for further proceedings not inconsistent herewith.

## APPENDIX # 1

STATUTES (All applicable statutes are codified in Title 11 of the Delaware Code.)

§ 636. Murder in the first degree; class A felony.

(a) A person is guilty of murder in the first degree when:

\* \* \* \* \* \*

(2) In the course of and in furtherance of the commission or attempted

commission of a felony or immediate flight therefrom, he recklessly causes the death of another person....

§ 271. Liability for the conduct of another—Generally.

A person is guilty of an offense committed by another person when:

* * * * * *

(2) Intending to promote or facilitate the commission of the offense he:

a. Solicits, requests, commands, importunes or otherwise attempts to cause the other person to commit it; or

b. Aids, counsels or agrees or attempts to aid the other person in planning or committing it; or

c. Having a legal duty to prevent the commission of the offense, fails to make a proper effort to do so....

§ 1447. Possession of a deadly weapon during commission of a felony; class B felony.

(a) A person who is in possession of a deadly weapon during the commission of a felony is guilty of possession of a deadly weapon during commission of a felony.

Possession of a deadly weapon during commission of a felony is a class B felony.

* * * * * *

(c) Any sentence imposed upon conviction for possession of a deadly weapon during the commission of a felony shall not run concurrently with any other sentence. In any instance where a person is convicted of a felony, together with a conviction for the possession of a deadly weapon during the commission of such felony, such person shall serve the sentence for the felony itself before beginning the sentence imposed for possession of a deadly weapon during such felony....

§ 825. Burglary in the second degree; class C felony.

A person is guilty of burglary in the second degree when he knowingly enters or remains unlawfully:

(1) In a dwelling with intent to commit a crime therein ....

§ 832. Robbery in the first degree.

(a) A person is guilty of robbery in the first degree when he commits the crime of robbery in the second degree and when, in the course of the commission of the crime or of immediate flight therefrom, he or another participant in the crime:

(1) Causes physical injury to any person who is not a participant in the crime; or

(2) Displays what appears to be a deadly weapon ....

§ 3507. Use of prior statements as affirmative evidence.

(1) In a criminal prosecution, the voluntary out-of-court prior statement of a witness who is present and subject to cross-examination may be used as affirmative evidence with substantive independent testimonial value.

(b) The rule in subsection (a) of this section shall apply regardless of whether the witness's in-court testimony is consistent with the prior statement or not. The rule shall likewise apply with or without a showing of surprise by the introducing party.

(c) This section shall not be construed to affect the rules concerning the admission of statements of defendants or of those who are codefendants in the same trial. This section shall also not apply to the statements of those whom to cross-examine would be to subject to possible self-incrimination.

APPENDIX # 2

STATE OF DELAWARE

IN THE MATTER OF a 1973 Datsun 240 Z, )
New Jersey registration 584HOO, Serial )
Number HLS30160759, the registered )
owner being one Richard Massey. ) AFFIDAVIT AND APPLICATION
) FOR SEARCH WARRANT
)
)
)

STATE OF DELAWARE)
) SS
NEW CASTLE COUNTY)

On this __16__ day of __November__, A. D. 19__77__ before me, Judge Brothers New Castle County, State of Delaware, personally appeared Det. Alfred L. Scaroitti and Det. Albert R. Senior of the New Castle County Police who, being by me duly sworn, deposes and says that

He, They, has, have good reason to suspect and does, do suspect that within and upon a certain place located within Mill Creek Hundred, New Castle County, State of Delaware, to wit: the place known as a 1973 Datsun 240 Z. N.J. 584HOO and occupied by Richard Massey or any other person or persons, there has been and there is now located and concealed therein certain property which may be concealed on the premises of said 1973 Datsun 240 Z. N.J. 584HOO said property consisting of the following:

(a) paper, articles or things which are the instruments of a criminal offense and/or designed and/or adapted and/or to be adapted to be used in a criminal perpetration and/or

(b) property obtained in the commission of a crime; and/or

(c) in particular, _____

1 Ladies yellow gold ring containing brilliant cut diamond weighing .80 ct.

1 Ladies fancy platinum ring containing European cut diamond

1 Ladies yellow gold fancy guard ring

1 Ladies diamond engagement ring and wedding band

Civil War pistols

The offense to which the above property and/or person(s) relate and which affiant's believe to have been committed or is about to be committed, is the crime of Murder I as set forth in Title 11, Chapter 5 Section 636, Delaware Code of 1953, as amended.

3. The facts tending to establish the grounds of this application or complaint and the probable cause of affiant's suspicion that such facts exist, are as follows:

Whereas, on 8 November, 1977, a burglary/homicide was committed at 4 Brookvalley Road, Greenville, Delaware. Said victim of the burglary/homicide being Nancy Repman.

Whereas, your affiants were assigned to investigate said burglary/homicide.

NCCPD # 146A

Whereas, on 15 November, 1977, information was received that a Richard Massey was involved with the burglary/homicide and that the stolen property was taken to the home of Delores DeFelice, on the White Horse Pike, Elm, New Jersey.

Whereas, on 15 November, 1977, a search warrant was executed at the home of John

and Delores DiFelice, on the White Horse Pike, New Jersey, by your affiants and the Winslow Township Police Department.

Whereas, proceeds of the burglary/homicide were recovered in the basement and bedroom of the residence. Both areas in the house were maintained by Richard Massey, in the home of John and Delores DiFelice.

Whereas, on 15 November, 1977, a statement was obtained from Delores DiFelice, a respected member of the community of Elm, New Jersey and sister of Richard Massey. At this time, Mrs. DiFelice advised that on the 8th of November, 1977, at approximately 1330 hours, Richard Massey and an associate believed to be Robert Martin, came to her home with approximately 75 guns, antique type, and put them in her basement. She advised that this property remained there until she realized it was stolen during a burglary/homicide. She further advised that on 11 November, 1977, she told Richard Massey to remove the property from her house and Richard Massey did so.

Whereas, on 12 November, 1977 Richard Massey was last seen by Delores DiFelice loading property into his 1973 orange Datsun, N.J. 584HOO.

Whereas, on 15 November, 1977, warrants for murder in the first degree were executed on Richard Massey. Massey was stopped in his 1973 Datsun, N.J. 584HOO, which was towed to the New Castle County Police Headquarters, for safe keeping.

Whereas, due to Richard Massey leaving the DiFelice home on 12 November, 1977, where the stolen property was kept, and since Massey had not been seen again by his sister, we believe the vehicle he was apprehended in contains stolen property and proceeds.

Therefore affiant's pray that a search warrant may be issued authorizing a search of the aforementioned person(s) and/or premises in the manner prescribed by law.

s [signature]
s [signature]

Sworn to and subscribed before me this 16th day of November 1977.

s [signature]
Justice of the Peace
NCCCPD # 146B

SUPPLEMENTAL OPINION

On March 5, 1981 this Court filed an opinion which, *inter alia*, affirmed the defendants' convictions on three counts each of Possession of a Deadly Weapon During the Commission of a Felony, 11 *Del.C.* § 1447, and the underlying felonies of Murder First Degree, 11 *Del.C.* § 636(a)(2), Burglary Second Degree, 11 *Del.C.* § 825(1), and Robbery First Degree, 11 *Del.C.* § 832(a)(1). We also concluded that the Legislature intended to authorize the multiple convictions and the separate sentences imposed thereon in these cases. However, we ruled that the separate sentences imposed for each of these offenses could not stand, and a remand was ordered for resentencing consistent with the rulings in *Hunter v. State*, Del.Supr., 420 A.2d 119 (1980), and *Evans v. State*, Del.Supr., 420 A.2d 1186 (1980). See Section III A, *supra*.

A stay of the remand was ordered thereafter on the State's application and, therefore, the mandate in these cases was withheld. See Supreme Court Rule 19(a). The purpose of the stay was to await the outcome on the State's petitions for certiorari to the United States Supreme Court in *Hunter, supra*, and *Evans, supra*. The petitions were granted, and that Court vacated this Court's judgments and remanded the cases for further consideration in light of *Albernaz v. United States*, —— U.S. ——, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981). *Delaware v. Hunter* and *Delaware v. Evans*, —— U.S. ——, 101 S.Ct. 1689, 68 L.Ed.2d 190 (1981).

 The rulings in *Hunter* and *Evans* on which the panel relied in the March 5, 1981 opinion have now been abandoned by this Court, sitting *en banc*, for the reasons stated in *Hunter v. State*, Del.Supr., 430 A.2d 476 (May 12, 1981), and *Evans v. State*, Del.Supr., 430 A.2d 481 (May 12, 1981). For

the reasons stated in those opinions, the holding in Section III A of this Court's March 5 opinion reversing the separate sentences imposed for each of the offenses in these cases is vacated and those sentences are hereby affirmed.

■ Given our affirmance of the sentences imposed in these cases, it is now appropriate to reconsider the defendants' argument that the separate sentences imposed on their convictions for Murder First Degree (Felony Murder) and the underlying felony of Burglary Second Degree violate the Double Jeopardy Clause. See Section III B, *supra*. As our most recent opinions in *Hunter* and *Evans* make clear, the Legislature's intention is determinative of this federal issue: if the Legislature intended to authorize separate sentences for these offenses to be imposed in a single prosecution, the Double Jeopardy Clause is not offended.

■ We have recently considered and rejected an identical argument in a case where the defendant had been convicted and separately sentenced for Felony Murder and the underlying felony of Rape First Degree. *Whalen v. State*, Del.Supr., 434 A.2d 1346 (decided in part December 15, 1980; decided on motion for reargument and matters in which jurisdiction was reserved July 6, 1981). As in *Whalen*, the question of legislative intent cannot be answered solely by reference to the substantive statutes here involved, 11 *Del.C.* §§ 636(a)(2) and 825(1), since neither statute expressly discusses the problem of multiple convictions and sentences under both. The only statute which directly addresses this question is 11 *Del.C.* § 206(a)(1) which prohibits multiple convictions where one offense is a lesser offense included within the

other.* Our conclusion in *Whalen* that the underlying felony is not a lesser offense included in the greater crime of Felony Murder for the purpose of applying § 206(a)(1) is equally applicable in the instant cases. See *Whalen v. State, supra*, 434 A.2d at 1356–1357; see also *Jenkins v. State*, Del.Supr., 240 A.2d 146, 149 (1968), aff'd, 395 U.S. 213, 89 S.Ct. 1677, 23 L.Ed.2d 253 (1969). Thus, § 206 poses no obstacle to the separate sentences imposed in these cases for the crimes of murder and burglary. "Moreover, the societal interests sought to be protected by the statutes here involved are entirely separate and distinct." *Whalen*, 434 A.2d at 1358. As we noted in Section III A, *supra*, "The murder statute seeks to protect human life; ... the burglary statute seeks to protect the integrity of personal dwellings from intrusion by those with a criminal purpose." Given these distinct purposes to which the substantive statutes are directed, we conclude that the Legislature did intend to authorize the separate convictions and sentences for Felony Murder and the underlying Burglary Second Degree in these cases. Therefore, we hold that the sentences imposed in these cases do not violate the Double Jeopardy Clause as interpreted in *Albernaz v. United States, supra*.

The stay of remand is hereby vacated. AFFIRMED, in part; REVERSED, in part; and REMANDED for further proceedings consistent herewith.

---

* Section 206 provides in pertinent part:

"Method of prosecution when conduct constitutes more than 1 offense.

(a) When the same conduct of a defendant may establish the commission of more than 1 offense, the defendant may be prosecuted for each offense. The defendant's liability for more than 1 offense may be considered by the jury whenever the State's case against him for each offense is established in accordance with § 301 of this title. He may not, however, be convicted of more than 1 offense if:

(1) One offense is included in the other as defined in subsection (b) of this section....

\* \* \* \* \* \*

(b) A defendant may be convicted of an offense included in an offense charged in the indictment or information. An offense is so included when:

(1) It is established by the proof of the same or less than all the facts required to establish the commission of the offense charged...."